Lehigh & Wilkes-Barre Coal Co.'s Assessment.

Glen Alden Coal Co.'s Assessment.

Argued April 16, 1929.  Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ.

*Maurice Bower Saul,* of *Saul, Ewing, Remick & Saul,*
with him *J. H. Oliver, Evan C. Jones, Wesley K. Woodbury* and *Gilbert S. McClintock,* for Lehigh & Wilkes-Barre Coal Company, appellant.—The trial judge was correct in concluding that the testimony of the county's experts was "largely infected with the 'foot-acre' fallacy."

The trial judge was justified in concluding that the testimony of the county's experts "mounts to figures vastly in excess of any prices ever obtained or ever likely to be obtained on any sale of any substantial acreage unaffected by special circumstances of enhancement," and that several of the experts called by appellant "carried more conviction than any others": Charnetski v. Mining Co., 270 Pa. 459.

The court in banc erred in reversing the findings of fact of the trial judge, particularly regarding the reliability of the witnesses and in adopting, with a uniform reduction, the values fixed by the board of assessors: Mirkil v. Morgan, 134 Pa. 144; Clarkson v. Crawford, 285 Pa. 299; Cake's App., 110 Pa. 65; Iron & Coal Co. v. Fulton, 204 Pa. 44.

The only legal valuation of real estate is market value as evidenced by comparable sales and this court has never approved any other method except by agreement of the parties: Phila. & Reading C. & I. Co. v. Commis-

sioners, 229 Pa. 460; Reading C. & I. Co.'s Assessment, 290 Pa. 187.

*J. H. Oliver,* with him *Gilbert S. McClintock, Evan C. Jones* and *Wesley K. Woodbury,* for Glen Alden Coal Co., appellant.—The testimony of the witnesses for the appellee (county) is incompetent, and the court erred in basing its valuations in whole or in part on such testimony: Tiffany v. Ry., 262 Pa. 300; Hall v. R. R., 262 Pa. 292; Michael v. Pipe Line Co., 159 Pa. 99; Hoffman v. Berwind-White Co., 265 Pa. 476; Penn'a Co. for Ins., etc., Appeal, 282 Pa. 69.

The court erred in basing its decision as to the value of the coal lands involved, in part on the prices obtained in the various sales relied on by the witnesses, which prices were developed on cross-examination: Friday v. R. R., 204 Pa. 405; Pa. Co. for Ins., etc., v. Phila., 268 Pa. 559; Brown v. Scranton, 231 Pa. 593; Roberts v. Phila., 239 Pa. 339; Girard Trust Co. v. Phila., 248 Pa. 179; Llewellyn v. Coal Co., 255 Pa. 291; McSorley v. School Dist., 291 Pa. 252.

The value of the coal lands involved found by the court is against the clear weight of the evidence: Rockhill I. & C. Co. v. Fulton, 204 Pa. 44.

*John H. Dando* and *Richard B. Sheridan,* with them *John J. Hibbard, Michael A. Donohue* and *Edwin B. Morgan,* City Solicitor, for County of Luzerne, appellee.—The fact that the term foot-acre may properly describe what was done by the assessors and their engineer, in the instant case, does not make it the foot-acre method repudiated by the decisions of this court: Phila. & Reading C. & I. Co. v. Commissioners, 229 Pa. 460.

The value of the ideal acre, as used by appellee's witnesses, is founded on proper consideration of prices obtained for coal, as reflected by the knowledge of the witnesses of sales in general: DuBois's App., 293 Pa. 186.

The question of the market value of real estate is manifestly one of fact, and, on appeal, findings of fact by the court below based on sufficient evidence will not be disturbed except for clear error: Lehigh & Wilkes-Barre C. Co.'s Assessment, 225 Pa. 272; Lehigh Val. C. Co. v. Co., 255 Pa. 17; Miller's Est., 279 Pa. 30.

OPINION BY MR. JUSTICE KEPHART, September 30, 1929:

Appellants, owning certain coal lands in Luzerne County, took appeals to the court below from the assessment thereof by the county officers. In this court, they complain that the modifications of the assessment made by the court below were insufficient. We will discuss in this opinion the general questions involved in all the appeals.

The records show considerable feeling between the contesting parties, which accounts to some extent for the wide differences, running into many millions, in the estimated value of the lands. This was particularly unfortunate in view of the fact that the court below was afforded little assistance in the determination of a very difficult problem, the effect of which is not confined to the present controversy. The parties should realize there is a necessary relation between the county government and the raising of revenue to maintain that government, and, unless the spirit of fairness and helpfulness is lost, the settlement of such questions as assessment should be accomplished without much difference of opinion.

Appellants contend the assessments in question are grossly unfair; the county, on the other hand, asserts that the mining companies are seeking to evade their share of taxes. The appeals, in their legal aspect, challenge the method by which market value was arrived at, and the competency of the testimony on which the final conclusion was based. Appellants also aver that the

assessments as modified and approved by the court below were against the clear weight of the evidence.

The proper method for making an assessment is governed by the Acts of April 15, 1834, P. L. 509, section 2; May 15, 1841, P. L. 393, sections 4, 6; July 27, 1842, P. L. 441, section 13, and has been fully discussed in Lehigh & Wilkes-Barre Coal Company's Assessment, 225 Pa. 272; Reading Coal & Iron Company's Assessment, 290 Pa. 187, 193, and many intervening cases. The Act of March 24, 1905, P. L. 47, makes no change in the basis of determining assessable value: D., L. & W. R. R. Co. v. Luzerne County Commissioners, 245 Pa. 515. The legislature has fixed the standard of measurement; "scientific formulas" predicated on theoretical uses, location and the like applied to property should have small consideration in fixing assessable or market value. So also, little weight should be given the testimony of experts who go into strange localities to estimate assessable values and frequently base their conclusions on a theory built on an impossible or impracticable conception of uses or possible uses, with their own idea of ratio of worth as between vacant and improved realty. This is not the legislative method for ascertaining assessments.

The law reads: "Being valued at a sum or price not less than the same would bring at public sale." This is market value, a phrase well known to the ordinary citizen, and what the law requires cannot be disregarded no matter how desirable some other method might prove to be: Pennsylvania Stave Co.'s App., 236 Pa. 97; Delaware, L. & W. R. R. Co. v. Luzerne County Commissioners, supra. Ordinarily, by "fair market value" is meant the price which a purchaser, willing but not obliged to buy, would pay an owner, willing but not obliged to sell, taking into consideration all uses to which the property is adapted and might in reason be applied: Appeal of Penna. Co. for Insurances on Lives and Granting Annuities, 282 Pa. 69, 74.

The market value of coal land, on which assessment is based, takes into consideration, in addition to what has been discussed, actual conditions existing on the ground such as locality, coal formation, number, thickness and depth of the veins; quantity, quality, stratification, nature of overlying strata and pitch of the seam, and the difficulty in mining; whether the coal is gaseous, outcrop, basin, and such other elements as shown by experience to be necessary in determining values. Important, of course, is availability and possible demand for the product of the land. An estimate is made of possible tonnage; due allowance being made for coal that would be lost. For the purposes of assessment all these considerations must be reduced to market value of the tract as a whole.

The county concedes that market value as a general rule must be used, but say this land is all owned by five large companies, and there have been no sales of large or fairly large tracts of coal land upon which market value may be based; that there is no market value. It insists, therefore, upon the right to use the so-called foot-acre unit and justifies the result by evidence of sales of small tracts, prior assessments, and other similar transactions. In effect, the county authorities may set up their own base value per acre and conclude that it should be called market value. The foot-acre is one acre of coal one foot thick. If a vein or veins have a 10 foot thickness, there are 10 foot-acres of coal. An ideal acre of coal is an acre of virgin coal with all of the veins in the particular region of normal thickness, aggregating 60 feet. We will discuss later, in detail, the application of the foot-acre rule, and how its value was reached in this case.

The court below used, as one of its major elements in finding assessable value, the assessments of previous years made under the foot-acre rule. Another element was the fact coal was not sold on an acreage basis, but on a royalty basis of tons that could be mined and re-

covered when coal was in normal use in former years, the court supplying its own royalty figure. These facts were supplemented by sales of fractional acreages. The court below, in using such factors, neglected to take into consideration economic factors which had a depressing influence on market value in its true sense, or on any value theretofore existing. Too much weight was given the county's evidence and too little to that of the companies. Had all factors been given due weight a different result would have been reached. Because of the effect given previous assessments made when anthracite coal was flourishing, and because the court failed to consider other vital elements, we will state briefly the matters which influence market value.

One of the most potential elements of market value is the demand for the thing to be sold or valued. Any contingency which detrimentally influences demand will have a corresponding effect on market value. If you cannot sell anthracite coal, the land from which it is to come would be practically worthless. If the demand for the product decreases, the market value of the land suffers accordingly.

Anthracite coal from Pennsylvania has for many years been the chief heating fuel in the northeast, including the Lake States, the New England States and Canada. The first decisive inroad on that market came from the great strike in 1925-26; that was most serious. The effect of the strike was the introduction of active potential competitors of anthracite; this was, and still continues to be, a great menace to the whole industry. It cannot be shaken off and the complete picture of the loss to the anthracite industry is yet to come.

The chief substitute for anthracite at that time was soft coal; it still stands as one of its strongest competitors, followed by oil, coke, gas, anthracite from Wales, and now from Soviet Russia, to say nothing of electric power. The latter during the last decade has, from water power supplemented by steam, expanded into mil-

lions of what is commonly termed horse power. Indeed it may be asserted that we are in the age of giant power. Those substitutes take the place of coal which heretofore was the means of producing power or heat. Soft coal in competition with anthracite has also been aided by low freight rates to tidewater from southern states. It could be placed in New England harbors at a more attractive price than anthracite. The result is that the demand for anthracite has diminished to the point where it reacts on the market value of the land.

Figures tell the story. From the federal government's Mining Bureau Reports of 1926, the first year covered by this assessment, the loss to the industry over 1919-20-21 was approximately 5,000,000 tons, and for 1927 approximately 10,000,000 tons,—in dollars, close to $100,000,000. The 1928 report shows a greater loss. The place of anthracite was taken by the substitutes mentioned above. If this competition is increased by the lowered cost of mining soft coal in the southern states, through a reduction in mining wages, it is at once apparent that the additional burden of unfair assessments, producing high taxes in the anthracite fields, will increase the difficulties of the coal producers as well as that of their employees. The State has seen this difficulty and is gradually eliminating its tax upon anthracite. This is being done to aid one of Pennsylvania's chief industries. As the normal county, municipal and school tax is approximately 5% of the assessed value, in figures it means almost $1,000,000 yearly to one company. The resultant effect of all these factors on market value must be apparent.

Another matter should not be lost sight of in making assessments of coal lands. The highest market price for these lands was no doubt reached when the coal was being intensively mined and sold with competition not as keen. Public improvements, financing and municipal living were based on these assessments, and the style of the latter, in some instances brought before this

court, has been, to say the least, astonishing. In making or providing for these expenditures, whether through bond issues or future taxation, due allowance has not been made for the fact that when all the available coal has been exhausted, the coal lands, as a subject of taxation, will cease to exist, and there will be no such property to tax. There must be a corresponding diminution in the gross value of taxable property from which the municipality or county may recover taxes, or on which the value for past bonded indebtedness may be sustained. When to this feature is added a reduction in market value because of economic disturbances discussed, the net result must be a much lower market value for all assessable property. But the peak in valuation cannot be sustained, or, as is done in this case, added to through an arbitrary inflation of value. Here the market value, when coal was at its highest price, was raised 10%. Why this was done does not appear. We are not advised whether it was to stabilize existing values, or to provide an increased fund for expenditures.

As illustrating what may occur when the coal is exhausted from mining, as it is in some districts, it was stated that if the adjudication by Judge FULLER was permitted to stand, the municipality would be seriously handicapped in the conduct of business. Exorbitant real estate values, causing high taxes, are no comfort to taxpayers, nor, as has occurred in some cases in this region, is the embezzlement of public funds, reckless expenditures, or a style of municipal living beyond reasonable requirement. Under all the circumstances, a lessening of the cost of government should follow. Governments should not be conducted on the basis of excessive taxation. It must be remembered that in this region a reduction in the market value of coal land, or lessening of value by removing the coal, ultimately throws the burden of taxes and payment of loans on the surface land or home owners.

The coal companies are not entirely free from responsibility. Except in a few instances they permitted high assessment figures to prevail, thus encouraging the municipal conduct to which reference has been made. When the unexpected result of the strike appeared, the companies demanded relief. While not deprived of their right to a fair assessment simply because they did not object, it should be understood that their lands, based on present values, should bear a fair and full share of the burden of government; however, they cannot be singled out to bear the chief revenue burden because they are corporations.

As this land of appellants lies in the Wyoming area, the most valuable and productive in the anthracite region, its normal value is higher. The Wyoming area stretches from Carbondale to Shickshinny, with seven seams of coal of an average thickness of 60 to 70 feet, of a more continuous formation than any other region; it affords many inducements not found elsewhere in that territory. Mining conditions are better, the quality of the coal is such that it easily adapts itself to the prevailing sizes or uses, it has a decided advantage in the market over other anthracite areas in money as high as a dollar a ton.

The foot-acre for assessment was condemned by this court in Lehigh & Wilkes-Barre Coal Co.'s Assessment, 225 Pa. 272, and in Kemble's Estate, 280 Pa. 441; it has been approved in special cases. See Lehigh Valley Coal Co. v. Luzerne County, 255 Pa. 17. Even conceding the propriety of its use under the circumstances of this case, the excessive valuations arrived at indicate that it has been abused.

We now consider the application of the foot-acre rule to these cases. The price fixed for a foot-acre of coal was $550, or for an ideal acre of 60 foot thickness $33,000. This, it was claimed, was the real market value. Counsel admitted that from the many, many thousands of acres of coal in this district, no tract or fair sized

piece was ever sold at such a high figure or near it. The figure of $33,000 was reached, we understand, upon the basis of small sales or the present worth of sales or leases on royalty. This character of exchange yields a much higher price ultimately than an immediate sale for cash, but to take the total tonnage of a given tract and apply thereto a royalty price for a present-day sale, would make the sale price so high that it could not be secured for any fair acreage. The wide difference in the valuation, by the parties, comes from taking the top prices of small sales, the present worth of high royalties extending over a short period of time, or other inflating considerations to make up the county's claim, and low royalties over a long period of time, sales not fairly reflecting present-day prices and other deflating causes to lower the value. Royalties as low as $7\frac{1}{2}$ cents a ton and as high as 50 cents a ton were used as a base. It has been testified that royalties have been as high as 75 cents, $1 and $1.25 a ton. To maintain overhead expenses, such as interest, school, township, county taxes, and other charges based on such an assessment as the county made for the intervening years, would place upon this coal, when marketed, a price so high that it could not be realized in the market.

The county having assessed houses, lots and other properties on a basis of 60% of market value, 60% of the base $550 or $330 per foot-acre would for 60 feet of coal make $19,800 an acre. Again no sale of any acreage at or near this figure has been pointed out, including the sale made of the Halbach Tract by the alien property custodian in 1928. The assessors then, for the purpose of carrying out the foot-acre unit, divided the land into four major classes: coal under surface controlled, surface not controlled, area under saturated wash and area under river warrants. The ratio value for assessment purposes was applied over the entire field as the class warranted. Thus to fee ownership without liability for surface support or surface controlled $330 was

the assessable foot-acre value. Other foot-acre values for the various classes were as follows: Pillar coal under surface controlled $165; surface uncontrolled, solid $264, pillar $132; coal under saturated wash or where there was danger of water flooding the mines, solid $264 a foot-acre, pillar $100; river warrant, solid $200 and pillar $50. Under the last three general classes the assessor's theory was that there should be sufficient pillars to support the surface, lessening the cost of all these classes.

As to availability and possible demand, some of the land involved in these appeals embodied what may be called reserve or remote coal, that is, land from which the production of coal is held in abeyance for future use. Reserve coal land does not possess the same value in the market as that being actively operated. It may be years before this land would be devoted to actual production. To value such coal on the basis of present-day royalty would be to pyramid prices and disregard the fundamental idea of royalty sale. It is quite difficult to determine a royalty that would set the value of reserve coal.

Coal land assumes a higher value when it is engaged in active production, or where coal land is part of an active mine. It has an increased value over inactive land or reserve territory. Some coal operations possess both active and inactive land, but reserve territory beyond land in active operation would not be of as high a value as that close to active operation. It would be a mistake to value such tract on a tonnage basis of either class, consequently a medium price should be adopted, based on reasonable judgment, that would fairly reflect a market value under the system used for the entire tract. A higher market value attaches to many separate contiguous tracts of land brought into one ownership. It thereafter is one piece of land and presents a much wider field for operation sustaining a greater investment of capital in production.

In considering tax appeals, the weight of the evidence is before this court, especially is this so where the reasons for reversal are as here presented: Rockhill Iron & Coal Co. v. Fulton Co., 204 Pa. 44.

## Glen Alden Coal Company's Appeal.

These lands lie in Newport Township. The upper Newport field should have been assessed as a single tract. They were assessed as fourteen separate tracts at a total of $1,273,220 for 357.22 acres; they form parts of a single mining operation known as Bliss Colliery. Lower Newport, a single tract, was assessed at $3,845,815 for 819.13 acres. The total assessment amounted to $5,-119,035 based on 60% of the foot-acre value for the two tracts $8,531,780.

The court below found that it was not necessary to determine whether the foot-acre was used, saying "We deem the assessment unjust and excessive and the court has concluded to hear the appeal de novo." It also stated: "The court likewise finds that at this time coal lands are not sold on the acreage basis but on the tonnage basis of mineable and recoverable coal in the particular tract."

At the de novo hearing, the coal company's witnesses fixed the value of the assessable coal lands at $2,624,216, while those for the county fixed it at $8,136,748, a spread of $5,500,000. Testimony of experts on the county's behalf was produced to establish what was regarded as a market value. While these witnesses wished to avoid the foot-acre rule, their so-called "market value" was obviously based on it. The county also presented evidence of sales by lessees of rights under mining leases and similar transactions that included the settlement of disputes under the lease; sales of leases at discount values or royalties; sales of corporate stocks which included personal property, rights and equipment; of the right of surface support, or a covenant not to mine coal

under a city lot or small piece of ground, or by one company to another as lessee; fee simple sales of a fraction of an acre of coal which reduced to an acreage price in one instance would be as high as $107,000 an acre; and sales of tons of coal at present-day tonnage prices. There were but few cases of sales of small bodies of coal. These illustrations cannot explain or justify their own or the assessor's value of $33,000 an acre, except as indicated above. A market value could not be fixed satisfactorily on such testimony, especially in the light of the evidence presented by appellant.

Appellant's evidence consisted of sales in fee of certain acres made some time ago, options to purchase small acreages, sale of coal leases by lessor or lessee, royalty sales, outcrop sales of the Wey Tract of fourteen acres. Its experts also used present worth of royalties on the recoverable or marketable coal in each tract, but at different royalty rates, and the mineable period to determine present worth was carried over a great many years. This, of course, was not entirely fair.

In the case of the sales of coal lands by individual owners the court below was of opinion that the evidence of the sale of acreage could not reflect a measure of value because the vendee could not sell to any one but to the company that owned the land surrounding his property, that parties do not always deal on equal terms. The fact that the companies controlled surrounding territory might not of itself prevent the price paid for individually owned coal from reflecting market value. When such land is sold, it is not entirely fair to assume, as did the court below, that the price paid was below market value in the sense in which the term is used in the statute and defined by the courts, namely— a sale after full notice where it was open to all parties to bid. It has a closer relation to market value than most of the sales mentioned by appellee.

The remarkable thing about all this mass of testimony is that most of it came from experts of high stand-

ing on both sides; as the court below states: "All of these men, some professional mining and civil engineers, some managers and officials of various coal companies, all qualified by long experience in coal mining and familiar with sales of coal land, and knowledge gleaned from association with expert mining men, testified on behalf of appellant and appellee regarding the market value of these various tracts and the difference and variance in their figures is so surprising and amazing that it is utterly impossible to reconcile or harmonize their testimony." The court below continued: "Giving all of these men credit in expressing their honest opinion, it is hardly conceivable or credible that they could be so far apart in estimating the valuation of these tracts at a public sale; indeed, they are so far apart that any banking institution would hesitate to recommend a substantial loan in the nature of a bond issue on these tracts where the total valuations vary in millions of dollars." The court below after full hearing reduced the total assessment to $4,469,064.

Lower Newport is a field of reserve coal, owned in fee, without mining operation. The Wey and Williams Tracts might be considered as tending to show market value (the outright sale of the one occurred in 1907 and the sale of the other on royalty some years later); it would be unfair to consider the prices as market values. If royalty is to be used, the price should be as indicated above in discussing this character of land. Appellant's foot-acre value was between $110 and $130, appellee's $330, and the assessor fixed $220 for the reserve coal. As a result of our investigation, we have ascertained that the sale of the Halbach Tract of 143 acres was made by the alien property custodian in 1928. This land previously had been operated under lease, by the Lehigh & Wilkes-Barre Coal Company, which expired in 1927, and is supposed to fairly represent present-day value, though we cannot escape the conclusion that there was some compulsion in making the sale; as we

understand, the alien property custodian would not be permitted to hold this land indefinitely, but it was and is nevertheless an important item of evidence in determining the taxable value of appellant's land and must be given due weight by the court below, when it hereafter fixes that value in accordance with the views expressed in this opinion.

Upper Newport field presents a more difficult question because of the separate assessment of each of fourteen tracts. Unlike the preceding tract, this land is being actively operated. We have made an exhaustive study of the evidence, the photostatic records, and every matter submitted in connection with the valuation of this property; it would serve no useful purpose to review it in detail. We have accordingly arrived at the following conclusions: Market value is the standard for measuring value to be used in all cases of assessment. Where the parties fail to present sufficient evidence on which to find it, the authorities may use the best evidence obtainable: DuBois's Appeal, 293 Pa. 186. Where evidence of market value is lacking, and there is evidence tending to show foot-acre value, due weight must be given, before deciding what it should be, to all the conditions which would ordinarily affect the market value if there was one. The court erred in applying too high a royalty figure as the market value rate when the demand for the production is so low that a sale, public or otherwise, could not be effected at that rate. In considering previous assessments or royalty rates fixed some time prior to the instant assessment, the *present-day* condition of the market for coal must be taken into account. A prior assessment of property covering a given district cannot be increased by a fixed horizontal percentage; due regard must be had for the surrounding conditions affecting values, and each valuation must stand on its own facts. Reserve or remote coal should be assessed as such, distinct from many considerations affecting active coal or that close to active production,

The court below did not give sufficient consideration to the testimony of the landowner, attaching to it too little weight, and too much was given the evidence submitted by the county. For these and the other reasons hereinbefore expressed, the valuations placed on these tracts must be reversed, and a finding must be made by the court below in accordance with the views expressed in this opinion.

## Lehigh & Wilkes-Barre Coal Company's Appeal.

This is an assessment of 2,051 acres of coal land, excluding improvements, situated in the City of Wilkes-Barre. The market value fixed by the board of revision was $32,514,348 and the assessable value $19,585,609, that being 60% of the market value. The case was heard before Judge FULLER, who determined that the assessment was improper, and heard the case de novo. Each side produced five witnesses; and their testimony, which is very much like the testimony in all these appeals, will be mentioned by us later. The hearing judge condemned the county's testimony because it was "largely infected with the foot-acre fallacy" and the witnesses' testimony on value "mounts to figures vastly in excess of any prices ever obtained or ever likely to be obtained on any sale of any substantial acreage unaffected by special circumstances of enhancement." Judge FULLER found the assessable value to be $5,- 691,000, which is 60% of the market value. The case was heard by the court in banc, on appeal, and the sum fixed for assessment purposes was $17,070,865. From this the coal company has appealed. The hearing judge fell into the same error, only in the opposite direction, as did the court in banc; the former disregarded the county's evidence and the latter disregarded to a large extent the landowner's evidence, as it made a reduction of 12½%.

The assessment was made on fifty different contiguous tracts subdivided into many separate classes. The Act of Assembly requires the assessment to be of "tracts of land"; here it is composed of many small tracts. This does not mean that, where the ownership of contiguous locations come into one person or company, it is necessary that each separate purchase be carried through for assessment purposes. Such tracts, where used for a common purpose, may be joined as one large tract under the act. The fact that coal is owned by one person and the surface by different persons will not prevent the coal from being assessed as a single unit. This rule should be followed as to all contiguous land situated in a city, township or borough.

Appellant's witnesses fixed the value of 60 feet of virgin coal in this tract at $6,000 an acre, and where the thickness was less this value was reduced to the number of feet of thickness; and by percentage of foot-acre, or present worth of royalty, a market value was found, to which the ratio of 60% was applied. After carefully considering all the evidence, the photostatic copies and all matters submitted to us, we have reached the same conclusion as in the previous case, and hence we make the same order in this one.

The decrees in No. 192, January Term, 1929, and in No. 107, January Term, 1929, are reversed, and the records are remitted that reduced valuations may be made in accordance with the views expressed in this opinion, costs in each appeal to be paid by the appellee.