Suermann et al. *v.* Hadley, Treasurer
(White, Appellant).

Argued June 8, 1937. Before KEPHART, C. J., SCHAF-FER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Walter Biddle Saul*, with him *Joseph D. Burke, Michael J. McManus* and *B. D. Oliensis*, for appellant.

*Wm. A. Schnader*, of *Schnader & Lewis*, with him *Gilbert W. Oswald*, for appellees.

*Warwick Potter Scott, Laurence H. Eldredge* and *Robert T. McCracken*, filed a brief amici curiæ.

OPINION BY MR. CHIEF JUSTICE KEPHART, July 7, 1937:

This appeal is from an order granting a preliminary injunction restraining the treasurer and controller of

the County of Philadelphia from carrying into effect recent acts of assembly relating to the Board of Revision of Taxes, and the assessment of property in the County of Philadelphia, and from making any appointments of members of the Board under the authority conferred by these acts. The statutes propose to establish a comprehensive system for the assessment of real estate and personal property in the County of Philadelphia. Three acts were passed to accomplish this purpose and they will be referred to as follows: No. 111, April 28, 1937, P. L. 476, "A," relating to members of the Board of Revision and appraisers; No. 108, April 28, 1937, P. L. 472, "B," providing for an appointive power, and No. 112, April 28, 1937, P. L. 480, "C," concerning the system of tax assessments, and other related matters. As the Acts deal with the same subject matter and relate to each other, each may well be considered as part of one entire system.

The objections to the Acts are that they violate the fundamental law in many particulars and are therefore invalid. It is urged, on the other hand, that together the Acts constitute a revision and reorganization of an important function of municipal government necessarily entailing loss of office by the incumbents, and that they do not run counter to any constitutional inhibition on the power of the legislature in this respect.

The legislature may abolish or reorganize municipal or other agencies of government, whether they be cities, boards, or commissions, and the reorganization may be such as to require an effective abolishment of offices in the city, board or commission. The incidental loss of an office occasioned thereby merely results from the valid exercise of this undeniable power. When such actions of the legislature are not in opposition to the Constitution, there is no limitation on its power. Its acts may be unwise, unjust and violative of political, as well as other rights, of the citizens, but these considerations cannot justify the courts in holding the legislation un-

constitutional. Such has been, in substance, the view of this court in many cases.

Generally speaking, in analyzing governmental reorganization statutes, or those changing the method, conduct or operation of a municipality, one of its departments or other agency of government, which embody a comprehensive plan or system as they relate to officeholders, the difficulty encountered is in determining whether the change is of sufficient moment to sustain a finding of legislative intent to abolish the offices affected and to oust the incumbents as an incident thereof, or whether the legislature merely proposes the removal of incumbents, in contravention of the constitutional barrier [Article VI, Section 4] relating to the removal of appointed or elected officers. In considering acts of the legislature courts should be cautious in dealing with laws affecting the operation of the various agencies of government. Courts cannot be placed in a position, nor should they have the appearance, of being superlegislative bodies that control legislation because it is unwise, or is not in accord with the ideas of the judges. Courts are not guardians of political parties, creeds, or of any designated section of the social order; but when the people by their fundamental law have definitely restricted legislative activities, we are bound to give effect to the restriction.

The Board of Revision of Taxes in Philadelphia is an institution antedating the Constitution. The present members were appointed by the judges of the common pleas under the authority of the Acts of March 14, 1865, P. L. 320, and February 2, 1867, P. L. 137. It must be determined whether the legislature has indicated by these three Acts any intent to abolish this long established department; and, if so, whether their effect is to cause an actual abolition of the offices of the present members, or to continue the offices and bring about the removal of the incumbents in violation of Article VI, Section 4.

Act "A"[1] takes the first step toward remoulding the office. It deals with the members of the Board, their number, qualifications, and salaries; it creates the offices of the appraisers and defines, to some extent, their

---

[1] Act "A" provides:

"Section 1. . . . the board of revision of taxes in counties of the first class shall, after the first day of May, one thousand nine hundred and thirty-seven, consist of seven members, who shall be appointed for terms of six years as provided by law.

"Section 2. The respective members of the board shall have the following qualifications:

"Two of such members shall be attorneys-at-law. . . .

"One of such members shall be a construction engineer. . . .

"One of such members shall be a civil engineer. . . .

"One of such members shall be a real estate appraiser. . . .

"One of such members shall be a real estate broker. . . .

"One of such members shall be a business man or an accountant. . . .

"Section 4. The board shall organize each year by electing a chairman and a secretary from among its members. . . .

"Section 5. The board shall appoint a chief appraiser . . . [who] shall, at the time of his appointment, have had not less than ten years' practical experience in making real estate appraisals. It shall be his duty to supervise and assist in the setting up and maintaining of a scientific and modern system of appraisement and records thereof, and to supervise the making of assessments and the keeping of the records of the board in accordance with the directions, rules and regulations of the board.

"Section 6. . . . The board shall appoint two deputy appraisers . . . and two personal property appraisers, and as many senior assistants as it deems necessary, but not more than twenty. . . . Each of such deputy appraisers and assistant appraisers shall have had not less than five years' practical experience as a draftsman or a real estate broker or agent, or in the appraising and purchasing of real property, or in any branch of the building or construction trade. Each of the personal property appraisers shall have had not less than five years' practical experience in valuing securities and other personal property subject to taxation.

"The board shall appoint as many junior assistant appraisers as it deems necessary, but not more than ten. . . . Each of such junior assistant appraisers shall have had not less than three years' practical experience as a draftsman or a real estate broker

qualifications; it terminates the term of the present members of the Board; and it abolishes the offices of the assessors in addition to terminating their terms of employment. Appellees urge it violates Article VI, Section 4,[2] and Article III, Section 13,[3] of the Pennsylvania Constitution. Appellants contend that, as the removal of the members is merely an incident of the reorganiza-

or agent, or in the appraising and purchasing of real property, or in any branch of the building or construction trade, or shall be a graduate of, or a teacher in, a recognized college or university specializing in any of the subjects hereinbefore prescribed. . . .

"Section 7. The board of revision of taxes may, by general rules and regulations, prescribe additional qualifications, not inconsistent with the provisions of this act, to be possessed by the chief appraiser, deputy appraisers, personal property appraisers, senior assistant appraisers, junior assistant appraisers, and other employees of the board.

". . . All appointments shall be made pursuant to competitive examinations conducted by the board, which shall be open to all persons possessing the requisite experience and qualifications. Appointments shall, as far as possible, be made by advancement from among the employees of the board.

"Section 8. The terms of the members of the board of revision of taxes now in office in counties of the first class are hereby terminated as of the effective date of this act. The several assessors and personal property assessors, heretofore provided for by law in counties of the first class, are hereby abolished, and the terms of employment of the present assessors are hereby terminated."

Section 9 repeals enumerated acts and provides, "All acts and parts of acts, general, local and special, inconsistent herewith are hereby repealed.

"Section 10. The provisions of this act shall become effective immediately upon its final enactment."

[2] Article VI, Section 4, provides: "All officers shall hold their offices on the condition that they behave themselves well while in office, and shall be removed on conviction of misbehavior in office or of any infamous crime. Appointed officers, . . . may be removed at the pleasure of the power by which they shall have been appointed."

[3] Article III, Section 13, provides: "No law shall extend the term of any public officer, or increase or diminish his salary or emoluments, after his election or appointment."

tion of this department of local government, the loss of these offices is not contrary to either of these constitutional provisions, since the Act in effect, taken with the others, abolishes the old Board; or that, if it does not abolish, it shortens the terms of office of the members, neither of which is prohibited by the Constitution.

It cannot be doubted the board members are part of a system which at any time may be abolished, having its origin in legislative enactment, or may be reorganized in such way as to permit the abolishment of their office. But where the statute reorganizing the board and its functions, while adding some new duties and prescribing new qualifications for appointees, leaves intact the basic structure and purpose, here the system of assessment of real and personal property, it will not be assumed that the legislature intended by these additions to abolish the offices of the incumbents, unless the Act in other respects clearly works such result or manifests such an intent.

Reorganization of an existing system or department of government does not necessarily require abolition of prevailing offices; in fact, generally that is an unusual procedure, and the intent to wipe out the old structure must be clearly apparent. Abolishment of office carries with it the idea of doing away with the identical office perpetually; this is not accomplished by stating in one act that the office is abolished, and in another or the same act providing for the recreation of the same office or one substantially similar. When the legislature so acts it is simply attempting a removal from office in violation of Article VI, Section 4, and the act falls: *Commonwealth v. Clark et al.*, 327 Pa. 181.

But, here, leaving out all consideration of the character of the changes in the department affected, the legislature did not even purport to abolish the offices of the present board members; it merely terminated their term, or, in other words, attempted to remove them. Nowhere does Act "A" in terms abolish the office of members of the Board of Revision of Taxes. On the

contrary, the office itself continues.   While the legislature may diminish a term of office or curtail it, without offending Article III, Section 13, they cannot violate Article VI, Section 4, in so doing.   There is a vast difference between abolishing an office and removing the incumbents of an office.   Section 8 of Act "A" merely states, "the terms of the members . . . are hereby terminated."   There is no ambiguity in this clause.   The legislature intended to end the terms of the present members.

The effect of the termination clause was to remove the members in violation of Article VI, Section 4, and not to abolish the office.   This, however, was a minor feature of the comprehensive plan.   The legislature did not intend to offend the Constitution; therefore, this section must be read as though the terminating clause was not contained therein.   May we strike from the Act the unconstitutional portion and thereby save the remainder?   A statute may be unconstitutional in part and yet be sustained with the offending part omitted, if the paramount intent of the legislature will not be destroyed thereby: *Rothermel v. Meyerle,* 136 Pa. 250.   See also *Commonwealth v. Snyder,* 279 Pa. 234, 244; *Bagley Co., Inc., v. Cameron,* 282 Pa. 84, 89; *Commonwealth v. Humphrey,* 288 Pa. 280, 290; *Commonwealth v. Great American Indemnity Co.,* 312 Pa. 183, 197, and *Commonwealth v. Schuylkill Trust Co.,* 327 Pa. 127.   As the act did not, in terms, abolish the offices of the old members, the provisions for appointment of new members must be construed to be prospective.   The old members will, therefore, continue in their offices until the expiration of the terms for which they were appointed by the judges.   The legislature may change an "appointive power" but in so doing, generally speaking, it acts prospectively as in this case.   The legislature may also enlarge the membership of the Board; here it is enlarged to seven members.   The appellants, the new appointive power, will, under Acts "A" and "B," merely appoint

the remaining four members. We decide this with the more confidence, aside from the unquestionable mandate of the Constitution, because it is not controverted that the present incumbents possess all the qualifications[4] specified by the legislature for new appointees, and a contrary result would have the effect of undoing much of the work of the Board for the current assessment.

This conclusion could only be defeated if it is shown that the legislature possesses the power to remove any legislative officer or terminate his term without running counter to Article VI, Section 4. Does the legislature possess this transcendent power apart from the power of reorganization and abolishment? If it does then Article VI, Section 4, is meaningless. As to the power to remove, it reads: "Appointed officers . . . may be removed at the pleasure of the power by which they shall have been appointed." We have frequently said this is the constitutional method of removal of appointive public officers, and we have held that it is exclusive[5]: *Bowman's Case*, 225 Pa. 364; it applies to any public officer

---

[4] Cornelius Haggarty, Jr., is a member of the bar of this court and of Philadelphia County, and practiced in Philadelphia for more than five years immediately preceding his appointment, effective the first Monday of April, 1937.

John A. Voorhees, prior to his appointment to the board in April, 1926, was for seven years a real estate assessor in Philadelphia County.

William J. Benham, prior to his appointment to the board in September, 1925, was for more than twenty years engaged in the real estate business in Philadelphia.

[5] Of course public officers may be subject to impeachment under Article VI, Section 3; or to removal on conviction of misbehavior in office or infamous crime: Article VI, Section 4. The methods of removal are summarized by Justice GREEN, in *Houseman v. Commonwealth*, 100 Pa. 222, at page 230. "Under the new Constitution there are three kinds of removal, to wit, on conviction of misbehavior or crime, at the pleasure of the appointing power, and for reasonable cause on the address of two-thirds of the senate. All officers are subject to the first kind, appointed officers to the

appointed under the Constitution or under legislative authority, whether it is a state or municipal office: *Richie v. Philadelphia*, 225 Pa. 511; *Commonwealth v. Hoyt*, 254 Pa. 45; *Commonwealth v. Reid*, 265 Pa. 328; *Commonwealth v. Benn*, 284 Pa. 421; *Commonwealth v. Kelly*, 322 Pa. 178. Appellants cite various cases to sustain their concept of unlimited power of removal in the legislature; none of them present the situation we have before us, nor do any of them sustain appellants' broad proposition.

The cases relating to the removal of appointive officers other than as provided by Article VI, Section 4, fall under several general heads. First, where the legislature in its act of creation attaches to an office a condition of tenure or of the right of removal: *Milford Township Supervisors' Removal*, 291 Pa. 46; *Georges Township School Directors*, 286 Pa. 129; *Weiss, Appellant, v. Ziegler et al.*, 327 Pa. 100; second, where the legislature sets up a new, comprehensive system of operation of one of its agencies or a department of such agency, differing materially from the system it supplants, and abolishes the offices existing under the old system; or, third, where there is a complete abolishment of an office or a repeal of the acts by which an agency is created: *Commonwealth v. Weir*, 165 Pa. 284; *Commonwealth v. Moir*, 199 Pa. 534; *Lloyd v. Smith*, 176 Pa. 213. Where in any such reorganization or change any part of the old legislation is retained in the new, unless the changes created by the new system are of such nature in substantive parts as to uphold an intent to abolish existing offices, the old appointees continue in office in obedience to the constitutional mandate. Where there is doubt as to whether there is a substantial change supporting the exercise of the legislative power of aboli-

second, and elected officers to the third. It seems to us very clear that the word 'officers' here is used in the same sense throughout the section so far as their classification into state, county and municipal, is concerned."

tion, it should be resolved in favor of abolition. It is evident Act "A" does not come under any of these classifications.

Appellants further contend that the function of the Board of Revision of Taxes is legislative in character, and that the rule of *Commonwealth v. Benn,* supra, should apply; if so the legislature is the real appointive power with power to remove. But, appellant proceeds upon a mistaken theory as to the *Benn* case, and to carry that theory to its logical conclusion would imperil the Governor's power to remove executive appointees by broadening the definition of legislative function to include practically all governmental agencies created by the legislature. The *Benn* case held that as the General Assembly was the actual appointive power of the Public Service Commission it could, in delegating a share of this authority to another office, reserve the removal power to itself or limit removal by its appointive agent with its consent. The decision was based on the fact that rate-making is a legislative matter existing under the police power, and its exercise a legislative function. To hold that all boards or agencies created under the reserved power of the legislature, such as the Board of Revision of Taxes, exercise legislative functions, would introduce a new concept into the law. The board, with other allied duties, merely creates the basis upon which a tax may be levied. In no sense does it perform a function which is legislative in character. The legislature either fixes the tax rate itself or delegates this power to another agency, here City Council; and, in execution of the tax law and to permit the levy of the tax, a base on which it is to be applied is found by the assessing authorities in accordance with a standard fixed by the legislature. The finding of that base is purely an executive function delegated to a municipal agency.

While it is difficult to draw the line between legislative, executive and judicial functions, manifestly, if the Constitution is to receive its correct interpretation, the

line must be somewhere drawn. No constitutional provision declares that assessment of real estate is a legislative function; it is incidental to taxation, and its duties have always been performed locally and never by the legislature itself. Appellants' contention with respect to the *Benn* case involves too much. If it were successful, practically all officers of governmental agencies having their origin in legislative enactment, would rest secure from removal except by the legislature in the manner provided, which body, under the rule of that case, would be the appointive power and control removal.

Mention was made at the argument of this case of the office of assessor, and the fact that the Act is impracticable and unworkable as applied to it. In this connection we might say that the assessment for the year 1937, to be used as a basis for taxation in 1938, was started by the Board of Revision of Taxes with the necessary aid of the assessors early this year. There are upwards of 474,000 properties of the value of about three billion dollars to be assessed. The Board and the assessors are now in the midst of this assessment, and volumes of work have been completed. While much remains to be done, all assessment returns must be made by August 15th to the Board, and the aggregate certified to city council by November 1st under the laws as they exist at the present time. See Act of May 13, 1856, P. L. 567, Section 6; Act of February 2, 1867, P. L. 137, Section 2.

Act "C" provides that in the years 1937, 1939 and triennially thereafter, the Board shall assess real and personal property for taxation purposes. They are also required to establish a system of records, which shall include a complete survey of each parcel of ground and each building.[6] It will be extremely difficult to prepare

---

[6] Act "C" provides:

"Section 1. . . . That the board of revision of taxes in counties of the first class shall establish a system of tax assessments and

these records and complete the work within the time allowed for certification to Council, or indeed within time to levy a tax on the assessment for the City of Philadelphia, if this act is carried out literally; but if the services of all the assessors are dispensed with as proposed in Act "A," it would be utterly impossible to finish the task on which they are engaged. Interruption of, or interference with, the assessment at the present stage of its progress would doubtless result in a grave and serious breach in the financial life of the city.[7] It would imperil its credit and greatly injure its people. We must not attribute to the legislature the intention to produce such a chaotic condition in creating a comprehensive scheme of assessment, which as a structural piece of legislation is constitutional but, on the contrary, we must view its effect as an attempt to bring about improved conditions.

There is, in our opinion, some question as to whether the office of assessors is really abolished by the Act, whatever its mere verbal declaration to that effect. If

records thereof which shall include a complete survey of each parcel of ground and of each building and other improvement in the county and a record thereof, showing, in full detail, descriptions, character and size of both land and buildings and other improvements, together with the names and addresses of the owners thereof, and the amounts for which such land, buildings and improvements, respectively, stand assessed and the basis upon which such assessments were made. . . .

. . . . . . . . . . . . .

"Section 3. Immediately after their appointment in the year one thousand nine hundred and thirty-seven, and again during the year one thousand nine hundred and thirty-nine, and triennially thereafter, the Board of Revision of Taxes may assess, rate and value all objects of taxation, whether for county, city, school, or poor purposes, according to the actual value thereof. . . ."

[7] We take judicial notice of the accumulated deficits in the city's financial operations resulting in a total shortage of more than $29,000,000, a greater deficit than has ever existed in its history. It has become so acute that the city was forced to appeal to the legislature to furnish relief.

in substance there is not an abolition of the office, but only an attempt to remove the present incumbents, such attempt would be abortive under the Constitution, for the reasons stated in other cases, in which opinions are this day handed down. But we are not called upon to decide this question in the present proceeding, which concerns only the removal of Board members, and the appointment of new members by appellants. The assessors are not parties to this action.

That the City of Philadelphia should not suffer and that the new Act may be given a reasonable interpretation, the enlarged Board of Revision can take over and adopt as part of the comprehensive plan such records of the old Board as conform to the requirements of Act "C," which generally speaking, would include the assessment records of all properties, with the exception that no distinction shall be made between farm, suburban, and urban property, as provided by Section 3 of Act "C." This change, it is estimated, will increase the city's annual revenue through taxation approximately $800,000 upon rural and suburban property which has an aggregate value of more than $141,000,000. Acts, which have not been repealed, require surveys and records to be made, and these may well supply the information and data called for by Act "C." The assessors, as lawful or de facto officers with their knowledge of the details of assessment, will thus be able to complete their work and act in appeals taken after their returns to the Board, as required by law. This would make the present assessment legal under the new Act, and the Board will have until 1939 to put into effect the comprehensive scheme contemplated by it.

Appellees object to Act "C" as being in violation of Article IX, Section 1, the tax uniformity clause of the Constitution, in that it sets up a standard for value in counties of the first class differing from that in other counties. The new Act states that assessment must be according to the actual value, and in arriving at such

value the sale price shall not be controlling. The Act of May 22, 1933, P. L. 853, Section 402, defines assessable or actual value. In *Lehigh & Wilkes-Barre Coal Co.'s Assessment,* 298 Pa. 294, this court held that the value for assessment purposes under the Act of 1841, where the language was identical to the Act of 1933, was "market value." See also *P. & R. C. & I. Co. v. Northumberland County Commissioners,* 323 Pa. 185. Sale price, while an important element of market value, has never been held controlling. See *Edmonds's Appeal,* 314 Pa. 382; *Westbury Apartments, Inc., Appeal,* 314 Pa. 130; *Hickey's Appeal,* 326 Pa. 467, where we held that the price for which the property sold at a bona fide sale was not controlling where evidence was adduced to show a higher value. The sale price was entitled to great weight as an important item of evidence but market value was the actual value for assessment uninfluenced by vague theories of actual value. Likewise, a bona fide offer of sale is not solely determinative of market value, but is merely evidentiary: *American Academy of Music Appeal,* 321 Pa. 433. Act "C," therefore, merely codifies the rule laid down by this court on this subject, and provides no new basis for assessment in counties of the first class.

In another particular, Section 3 of Act "C" is also alleged by appellees to violate Article IX, Section 1, namely, the provision that the board *"may* assess" triennially. Appellees maintain this permits an indefinite deferment of assessment without the compulsory requirement of assessments at reasonable intervals, or triennially. We construe the word "may," as used in Section 3, as mandatory, and to provide that assessments must be made triennially. It is significant that in Section 6 of the Act this thought is carried out.

Acts "A," "B" and "C" are said by appellees to violate the provisions of Article III, Section 7, as being local and special laws. Appellees contend the Acts are local because they relate only to the County of Philadel-

phia and the existing Board of Revision of Taxes, and that no other city of the first class can ever have such a board without supplementary legislation. The case of *Blankenburg v. Black,* 200 Pa. 629, is principally relied upon by appellees as sustaining their contention. The distinction between that case and the present one is clear. The Acts apply to all cities of the first class and are not by their title limited to Philadelphia, as in that case, which is the only county co-extensive with a city of the first class now or likely to be in existence. The new Acts provide a complete method for tax revision in all cities of the first class and a uniform procedure for assessment. The case of *Perkins v. Philadelphia,* 156 Pa. 554, cited by appellees for the same proposition, likewise discloses an important point of difference. There the Act of Assembly, although stated to apply to all cities of the first class, could apply only to Philadelphia, because it had reference to the erection of public buildings on one of two designated sites within the limits of that city. These two cases, as well as the case of *Commonwealth v. Gumbert,* 256 Pa. 531, were decided prior to the enactment of the amendment of 1923 to Article III of the Constitution (Article III, Section 34), which recognized the propriety of legislation relating to the existing classes of cities, counties and other subdivisions, and providing that all laws relating to each class should be deemed general within the meaning of the Constitution. See *Commonwealth v. Wert,* 282 Pa. 575; *Sambor v. Hadley,* 291 Pa. 395; *Retirement Board v. McGovern,* 316 Pa. 161.

As to the objection that it is improper to classify counties of the first class separately for the purpose of real estate assessment, see *Jermyn v. City of Scranton,* 186 Pa. 595; *Phila. Co.'s Petition,* 210 Pa. 490. The contention of appellees that Act "C" is special and local in that it creates a unique basis of assessment for counties of the first class need not be considered because it

has been shown that no change has been made by the new Act in the formula for valuation.

We need not discuss at length the objection raised by appellees under Article III, Section 3, relating to title. The first objection is that it involves the preparation of bills by the Board of Revision of Taxes for city, school and poor tax purposes (Section 10). This is not unrelated to the general scheme of tax administration set up by Act "C" and it is certainly indicated in the title under the clause "imposing duties on the board of revision of taxes, etc."

The second objection is to the provision of Section 3 that "No distinction shall hereafter be made between farm and suburban property and urban property" in making assessments. Assessors were required to classify property under these headings in making a return to City Council so that it might impose a rate of tax on each of the three classes: Act of March 24, 1868, P. L. 443, Section 1; Act of May 13, 1856, P. L. 567, Section 6. Thus it is urged that since the Board is no longer to classify the property but to assess all property in one class on one standard, the City Council will have no means of imposing the various rates of tax according to classes, and thus the system of varying rates for the several classes is abolished without notice in the title. The same reasoning leads to the conclusion that Section 3 repeals, by implication, the rate classification. Regardless of the effect of this section of Act "C" the subject does relate to assessments and to the duties of those making them, and is germane to the subject matter of the bill as indicated in the title. The title of the present Act certainly indicates the intention of the legislature to deal with all matters relating to the system of tax assessment in counties of the first class and serves to place all property owners and other persons interested upon notice of its broad scope.

Article XIV, Section 2, relates to the election of county officers. Appellees contend that the members of

the Board of Revision of Taxes are county officers, and the Act is invalid as it provides for appointment, rather than election. This question was directly passed upon in *Commonwealth v. Collier,* 213 Pa. 138. See *Commonwealth v. Collins,* 316 Pa. 353. Even if this should not be the law, it may be said that in view of the fact the Board was created by special and local act prior to the Constitution of 1874 and provision was made for appointment by these Acts, the legislature has the power to modify, enlarge or amend the provisions of these Acts without being restricted by the special and local clause. Therefore, there is no reason why the legislature cannot continue in force the old provisions as to the appointment of the members of the Board. The rule that the special and local clause does not apply to modifications or amendments of such laws existing prior to the Constitution of 1874 was applied in *Milford Township Supervisors' Removal,* 291 Pa. 46, citing *Georges Township School Directors,* 286 Pa. 129.

The decree of the court below is modified as follows: WillB Hadley, Treasurer of Philadelphia, and, Appellant, Robert C. White, Controller of Philadelphia, their successors, agents and employees, are restrained permanently from interfering in any manner with John A. Voorhees, William J. Benham, and Cornelius Haggarty, Jr., members of the Board of Revision of Taxes of Philadelphia, in the performance of the duties of their office for the duration of the term for which they have been appointed; the current work of assessment shall continue to completion, and the real and personal property assessors of Philadelphia shall be paid their salaries during their continued employment; appellants, the new appointive power, shall forthwith fill the vacancies in the Board of Revision of Taxes, and the Board shall proceed as directed by Acts Nos. 108, 111 and 112, approved by the Governor on April 28, 1937, to set up the comprehensive system of assessment contemplated by these Acts.