Lehigh Navigation Coal Company's Appeal.

Argued April 14, 1937. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Charles E. Berger,* with him *Ben Branch, George H. Kaercher, Samuel D. Matlack* and *William Jay Turner,* for appellant.

*W. D. Lewis,* for appellee.

OPINION BY MR. JUSTICE BARNES, July 7, 1937:

This is an appeal by the Lehigh Navigation Coal Company from the assessment of its coal bearing land in Mauch Chunk Township, Carbon County, at the triennial assessment of 1934. Appellant's property, including all improvements thereon, was originally returned by the assessor at a value of $2,804,224. This figure was revised by the County Commissioners, acting as a Board of Revision, to $3,771,155. Upon appeal to the Court of Common Pleas, the court reduced the assessment to $2,584,473 made up as follows:

| | |
|---|---|
| 1,930.13 acres Coal Bearing Land, together with improvements, at $1,272.64 per acre .... | $2,456,360.00 |
| 3,932.34 acres Barren Land, at $10 per acre ...... | 39,323.00 |
| Hauto Storage Yard .................... | 32,800.00 |
| Town Lots and Improvements .......... | 55,990.00 |
| Total ......................... | $2,584,473.00 |

Exceptions to the decree nisi were overruled, and from the final decree the company appealed. This appeal, however, relates only to the first item of the assessment as fixed by the court, that is, to the valuation placed upon appellant's coal bearing land; no complaint is now made as to the valuation of the barren land, or of such improvements as were separately assessed.

Referring particularly to appellant's coal bearing land and the improvements thereon, we find that they were returned for taxation by the assessor at $2,524,633. The Board of Revision raised the assessment to $3,635,-

764. A part of the variance between the assessor, the Board of Revision and the court below is explained by the fact that different acreages were used in each instance. At the hearings the witnesses for both sides agreed that the total area of appellant's holdings within Mauch Chunk Township is 5,862.47 acres, forming one contiguous tract, of which 1,930.13 acres are underlaid with coal, comprising the entire coal bearing area of the township, and 3,932.34 acres are barren, containing no coal. The court below so found, and valued appellant's 1,930.13 acres of coal land at $2,545.28 per acre. Inasmuch as real estate is valued for tax purposes in Carbon County at only 50% of market value, the court assessed the property at one-half of this figure—$1,272.64 per acre, making a total of $2,456,360.

From the record it appears that the land involved in this appeal constitutes the easternmost part of what is known as the Southern Anthracite Coal Field. This field begins at Mount Pisgah in Mauch Chunk Township, and extends westwardly through Schuylkill and Dauphin Counties. Coal has been mined in this region since 1832, and the territory is now being operated by three collieries, all of which are owned by appellant. The greater part of the area is mined from the Nesquehoning Colliery in Mauch Chunk Township, but a strip along the western border of the township is mined from the Lansford· Colliery in the adjacent borough of Summit Hill, and another small section is operated from the Coaldale Colliery in Schuylkill County. Owing to the fact that the strata in this region have been subjected to much folding and distortion, the coal is difficult and expensive to mine, and produces only about 40% of the so-called "prepared sizes" as compared with a general average of about 55% in other parts of the anthracite fields. As the prepared sizes command a better price in the market, this reduces the earning power of the property; it was shown that a difference of 1% in the yield of prepared sizes causes a difference

of approximately 5 cents a ton in the monetary return. However, when prepared, the coal produced from this territory is of as high a quality as that produced anywhere in the anthracite regions. The land in question contains seven veins of coal, all but one of which have marketable coal; the veins, however, are not uniform, and in some areas are so distorted and broken by faults as not to be minable. Moreover, the coal in this region is highly gaseous, necessitating the use of safety and electric lamps in the mine, and creating a serious ventilation problem. At the present rate of production, appellant's property has a life as a mining proposition of approximately seventy-five years.

Much of the testimony presented by appellant was devoted to showing the steady and progressive decline in the market for anthracite coal. It was shown that from 1926 to 1933 the consumption of such coal declined over 40%. Meanwhile, the price received per ton fell over 27%. The interaction of these two movements is reflected in the statistics from Carbon County, where during the same period production declined almost 37%, while the value of the coal sold fell over 51%. These figures demonstrate that the unfortunate condition of the industry, which we had occasion to consider at length in *Lehigh & Wilkes-Barre Coal Co.'s Assessment*, 298 Pa. 294, and *Phila. & Reading Coal & Iron Co. v. Commissioners of Northumberland County*, 323 Pa. 185, has not improved, but on the contrary the competitive position of anthracite steadily has grown worse. While its cheaper competitors, soft coal, coke, oil and hydro-electric power, have continued to gain ground, anthracite, hindered by increased productive costs and taxes, has been unable to retain the markets which it once possessed. These developments are necessarily reflected in the market values for anthracite coal lands, and should be given consideration in fixing their assessments, otherwise the burden of taxation per ton of coal produced is to that extent increased. Of course, as we

pointed out in the cases cited above, coal lands should bear their full and fair share of the cost of government, but they should not be singled out and required to pay a disproportionate amount of the tax revenue.

In his adjudication the learned judge of the court below reviewed the evidence at length, and made detailed findings in which he classified appellant's total coal acreage as follows: (1) 129.84 acres are reserved as a barrier between the Nesquehoning Colliery and the Lansford Colliery to the west, and as a pillar required for support of the shafts and tunnels at Nesquehoning. These areas cannot be mined until the coal has been removed from the surrounding territory, and hence their principal value now lies in the safety they lend to the operations rather than in coal contained therein. (2) Another large area, comprising 76.11 acres has been flooded, and while the coal in this section can be mined whenever the water is removed, it is not presently available. (3) The coal underlying 602.37 acres, amounting almost to one-third of the original coal-bearing area, has been exhausted or is so thin and faulty as not practicably to be minable. This acreage contains no coal of present worth and its principal value is as an adjunct to appellant's mines. (4) The balance of 1,121.81 acres, somewhat more than one-half of the coal area, is available for production. Approximately one-fourth of this coal, however, is so remote from the present workings that it must be classed as reserve coal. Despite these explicit findings, the court below in its final decree placed a uniform value upon the entire coal-bearing acreage, without any differentiation in value between the various areas above described. However, in reaching this uniform rate the court assigned a different value to the barrier and shaft pillars than to the rest of the coal area. This is shown by the fact that while in the decree nisi these areas were valued separately, in the final decree no such separation was made, although the total valuation was not changed.

This action of the court below was perhaps predicated upon our repeated suggestions that where contiguous land in the same ownership is devoted to the same use, it is a proper and desirable practice to assess it as one tract: *Lehigh and Wilkes-Barre Coal Co.'s Assessment,* supra; *Phila. & Reading Coal & Iron Co. v. Commissioners of Northumberland County,* supra. This does not mean, however, that where the conditions and use of portions of the same tract require the application of different standards of value, such parts may not be valued separately, and the total of such separate valuations used as the assessment for the entire tract. Indeed the court below recognized this in assessing separately the barren land at a nominal figure, although a part of it was devoted to use in connection with appellant's operations. Obviously, land from which the coal has been fully extracted stands in a different class from land not yet exhausted.* Similarly land from which the coal cannot now be mined, either for reasons of safety, or because the area is flooded, or because of the expense of mining, does not have the same value as that which is in active production. These differences, we think, might properly have been reflected by the court below in its decree: *Glen Alden Coal Co. Case,* 321 Pa. 333. A recapitulation setting forth valuations for the different areas would have indicated clearly upon what factors the court placed greatest weight. It is impossible to discover from the adjudication what values were assigned by the court to the different areas in arriving at its uniform value of $2,545.28 per acre, and this might

---

* It should be noted that the General County Assessment Law of May 22, 1933, P. L. 853, pursuant to which the assessment before us was made, apparently contemplates that exhausted coal land is to be assessed separately from active mining land. In Section 432, relating to inter-triennial assessments, it is provided that, in the inter-triennial returns to be made by the assessors, they shall note "such alterations as may have been occasioned . . . by the mining out of coal, ore, or other minerals assessed under the triennial assessments. . . ."

well lead to the misapprehension that it placed the same value upon the exhausted and faulted land, and upon the flooded areas, that it gave to the minable coal. Nevertheless, we cannot say that the failure to make such separate valuations was error. It is apparent that if the total valuation fixed by the court was not improper appellant has not been harmed.

We have frequently had occasion to state the factors to be considered in fixing the taxable value of coal lands, and they need not now be stated at length. The legislature has prescribed market value as the standard for assessment, and, of course, the prices paid in sales of similar properties constitute the most easily applied standard for the determination of market value. But where, as here, we are concerned with a tract of large extent, purchased, as were most of the larger and more desirable coal tracts, many years ago, there are no sales available for comparison. The court below so found. In such case it is proper to study those elements of intrinsic value which a prudent purchaser would take into consideration. With property used for industrial purposes, as anthracite coal land, a most important factor is the return which it will yield to its owner. Can the coal be mined and sold at a price sufficient to return a profit to the operator, and, if so, how large? To determine this, particular attention must be had to the state of the market and the cost of production—which in turn necessitates an inquiry into the physical features of the property: *Phila. & Reading Coal & Iron Co. v. Commissioners of Northumberland Co.,* supra, and cases there cited.

Appellant produced, as witnesses on its behalf, four mining engineers, all of whom were shown to have had experience in the anthracite fields, and to be qualified to express an opinion as to the value of appellant's property. Their estimates of value range from $1,449,000 to $1,542,000. For the county, three mining engineers, of like experience and qualification, testified that the

same property is worth from $8,495,000 to $8,682,000. This variance is too wide to be reconciled. Nevertheless, the witnesses were substantially agreed as to the area of appellant's lands, and as to the physical features of the property. All purported to have taken the same factors into consideration in reaching their estimates of value.

The difference between the values given by the two sets of witnesses is explained, we believe, by the fact that the witnesses for the county failed to consider certain factors which undoubtedly would have reduced their estimates. They valued appellant's coal land at an average of almost $4,300 an acre, a figure in excess of any price shown to have been paid for anthracite properties, either recently or in the past. Each of the county's witnesses used as one of the elements upon which he based his opinion an assumed or potential annual production of one million to a million and a half tons, despite the fact that it was shown that the greatest annual production from appellant's operations in the township was about 980,000 tons in 1917 and 1918, and that due to the decline in the industry, production had fallen to approximately 500,000 tons in the five years immediately preceding the assessment. They conceded that it would require a large amount of money to develop the property for greater production, and to equip the breaker to handle so large a quantity of coal. None of the county's witnesses was able to say, however, how large an expenditure would be needed, or to what extent the necessity for such capital investment would affect the market value of the property. This omission seriously weakens the value of their testimony. If money must be spent to fit property for a potential use upon which an estimate of value is based, the amount of such requisite expenditure must also be taken into consideration: *Edmond's App.*, 314 Pa. 382.

Moreover, in basing their opinions in part upon a large increase in production, the county's witnesses

demonstrated that they had not given consideration to the continued shrinkage in the market for anthracite coal. Under the existing conditions of the anthracite coal market, as we pointed out in *Phila. & Reading Coal & Iron Co. v. Commisisoners of Northumberland Co.*, supra, productive mines can now more than supply the present demand for coal. The facts contained in the record before us, as found by the learned judge below, indicate that nothing has occurred since the time referred to in that opinion to improve the situation. Under these circumstances, it is folly to predicate an estimate of value of anthracite land upon an increase in production, unless it is also shown that the product can be marketed at a profit, either because of reduced cost of production or of increased consumption.

We feel that the court below placed undue weight upon the testimony of the witnesses for the county. If from the total valuation fixed by the court there is deducted the value of the pillar areas at the rate tentatively set in the decree nisi, and the value of the flooded, exhausted or faulted areas at the highest rate given by any of the witnesses who valued them separately, it will be found that the court assigned to the actively operated coal land a value of over $4,250 an acre. This is practically the same value as that placed on the property by the county's witnesses, whose opinions, as we have shown, were based upon mistaken considerations which led them to overvalue the property. By relying upon their estimates, these errors were carried by the court below into the valuation fixed by the final decree. It follows that the assessment is too high and must be reduced.

The assessment from which this appeal is taken was made almost three and one-half years ago. The appeal to the court below was taken in June, 1934. Hearings were not begun until February, 1935, and were not concluded until the end of the year, testimony having been taken on fifty-two days during the intervening months. The decree nisi was filed in May, 1936, and the final

decree the following July. For us now to remand the case would cause further delay. It is of the utmost importance to the revenues of the county and township dependent upon this assessment that the controversy be not prolonged. We shall, therefore, revise at this time the assessment appealed from, to accord with our views as to the weight of the evidence in the light of the principles above discussed. We must again state however, that our action is not to be taken as a precedent, but is necessitated by the unwarranted delay in bringing the case before us. Our valuation of the property in question, according to the classification made by the court below, is as follows:

| | Area | Market Value Per Acre | Total Market Value | Assessment Value Per Acre (50%) | Assessed Valuation |
|---|---|---|---|---|---|
| Active Coal Land ... | 1,121.81 A. | $3,000 | $3,365,430 | $1,500 | $1,682,715 |
| Barrier & Shaft Pillars ..... | 129.84 A. | 400 | 51,936 | 200 | 25,968 |
| Flooded Area . | 76.11 A. | 2,000 | 152,220 | 1,000 | 76,110 |
| Exhausted or Faulted Land . | 602.37 A. | 100 | 60,237 | 50 | 30,119 |
| Totals . | 1,930.13 A. | | $3,629,823 | | $1,814,912 |

in addition thereto the following items not in controversy in this appeal:

| | |
|---|---|
| 3,932.34 acres Barren Land at $10 per acre .... | 39,323 |
| Hauto Storage Yard ........................ | 32,800 |
| Town Lots and Improvements ................ | 55,990 |
| Total ............................... | $1,943,025 |

The decree is modified and the record remitted to the court below that an order may be made carrying into effect the modifications set forth herein. Costs to be paid by appellee.