Glen Alden Coal Company, Appellant, *v.*
Commissioners of Schuylkill County.

160

Argued April 21, 1942. Before SCHAFFER, C. J.;
MAXEY, DREW, LINN, STERN, PATTERSON and PARKER, JJ.

*J. H. Oliver,* with him *George H. Kaercher,* and *Roy
P. Hicks,* for appellant.

*James J. Gallagher,* with him *Henry Houck* and *G.
Harold Watkins,* for appellee.

OPINION BY MR. JUSTICE MAXEY, July 20, 1942:

This is an appeal from the final decrees of the Court
of Common Pleas of Schuylkill County in the matter of
the assessments of the coal lands of the Glen Alden Coal
Company, hereinafter referred to as the Company, situ-
ated in Kline Township, Schuylkill County, Pennsyl-
vania, for the respective triennial years 1931-1933, 1934-
1936, 1937-1939. The number of acres of the land in ques-
tion and *now underlaid* with mineable coal is 421.38.
The lands consist of five contiguous tracts, totalling
604.09 acres. The assessment is made on an acreage of
577. The property is fully developed and well equipped
for mining. The mining and transportation facilities are
good. Drainage for the property is provided by a tunnel
completed in 1930. Pumping of water is required only

from a shallow basin on a lower level. There is no reservation required for barrier pillars on surface improvements of the Company or others. All of the coal mined from this property and the Company's adjoining properties in Banks Township, Carbon County, is prepared at the Company's Audenried breaker.

There are five veins of coal on the tract, to wit: the Mammoth, Wharton, Gamma, Buck Mountain and Lykens. The Buck Mountain vein has two splits over a portion of the property. The veins pitch from five degrees to sixty-five degrees. The pillar and solid coal acreages of the several veins of coal on this property are as follows:

| Vein | Pillar | Solid |
|---|---|---|
| Mammoth | 144.08 | None |
| Wharton | 158.06 | None |
| Gamma | 160.78 | 45.13 |
| Buck Mountain | 248.70 | 29.75 |
| Lykens | 319.93 | 76.71 |

The depth of the basin of the Mammoth vein is from 360 to 400 feet. A large percentage of the Mammoth vein production comes from stripping operations, and the balance from "rock hole" mining. Appellee says: "Cross-sections of the Mammoth vein in possession of the Company disclose lines indicating the top and bottom of the vein, and when measured, these cross-sections disclose a thickness of vein as follows:

| | |
|---|---|
| G-619 | 32 to 48 feet |
| G-618 | 32 to 35 feet |
| G-646 | 28 to 39 feet |

The appellee produced a cross-section allegedly indicating the thickness of the Mammoth vein on this property as being more than 34 feet; and it says: "The Second Geological Survey of the Commonwealth of Pennsylvania, in its report of 1895, disclosed a vein thickness of the Mammoth Vein in the Beaver Meadow Basin, in which this property is located, of from 30 to 35 feet, and occasionally 60 feet."

Appellant argues: "The measurement of more than 34 feet" was taken from an old book: 'Coal, Iron & Oil', by Daddow & Bannan." The County's witness who referred to this admitted that the Mammoth vein consisted of various veins of coal and refuse and "in between each two of the six main benches of coal is a stratum of impurities." Appellant introduced sixteen measurements from Second Geological Survey & Mine Inspectors Reports for the years 1870 to 1875, showing a 25 feet thickness of this vein in this *coal basin;* some of these were in *this area.* Appellants witnesses declared the average thickness of this vein here to be 24 to 25 feet. The opposing parties agree that this vein is "generally inaccessible". The lower veins here are as follows:

| Vein | Vein Thickness | Coal Thickness |
|---|---|---|
| Wharton | 7 to 8 feet | 6.68 feet |
| Gamma | 7 feet | 4.17 feet |
| Buck Mountain | 7 to 8 feet | 5.59 feet |
| Lykens | 7 feet | 4.28 feet |

The year 1950 is fixed by the County and the year 1946 is fixed by the Company as the end of this property's economic life. The following tonnage was marketed from this property:

| | | |
|---|---|---|
| 1930 | 321,876 | gross tons |
| 1931 | 322,256 | " " |
| 1932 | 236,537 | " " |
| 1933 | 258,295 | " " |
| 1934 | 330,494 | " " |
| 1935 | 274,932 | " " |
| 1936 | 265,940 | " " |
| 1937 | 282,270 | " " |

There was no testimony showing the cost of production of coal at this property, or the realization per ton. As to this the Company says: "Labor cost, cost of supplies, local taxes and other costs of this colliery could be ascertained but the costs of superintendence, administration, depletion and depreciation, State and Federal taxes, obsolescence, selling expenses and the like, not being allo-

cated to this property, one of an operating whole, could not be."

The Company and the County each called three "expert witnesses" who testified as to the value of this coal land. The following table shows the highest and lowest values fixed by, respectively, the Company's witnesses and the County's witnesses and finally by the court:

| Year | Company's Witnesses | | County's Witnesses | | The Court |
|---|---|---|---|---|---|
| | (High) | (Low) | | | |
| 1931 | $850,000 | $725,000 | $1,650,000 | $1,530,000 | $1,298,250 |
| 1934 | 550,000 | 500,000 | 1,300,000 | 1,250,000 | 1,096,300 |
| 1937 | 475,000 | 400,000 | 1,335,000 | 1,200,000 | 692,400[1] |

It was agreed that for the 1931 and 1934 assessments the ratio between market value and assessed value is forty per cent. For the 1937 assessment the County contended and the court so found, that the ratio was sixty per cent.

The decision in this case rests on three factors. They are: First: The tonnage of unmineable and marketable coal in this tract. Second: To what extent did the unfavorable economic conditions of the anthracite coal industry in general during the period covered by these assessments adversely affect the value of this property? Third: To what extent did the lawless practice of so-called "bootleg mining" in Schuylkill County adversely affect the value of this property?

The differences between the Company and the County with respect to the first factor, that is the marketable tonnage at the time of these several appeals arise from differences of "expert opinion" on the following sub-factors:

A. The amount of coal removed from the Mammoth vein in "first mining".

B. The thickness of the Mammoth vein on this tract.

C. The thickness of the four lower veins, principally the Buck Mountain vein.

D. The percentage of coal in place in all five veins which will be recovered.

---

[1] This does not include buildings, whose full value the court fixed at $134.000.

E. The percentage of recoverable and marketable coal from all of the veins.

The difficulty of reaching a conclusion as to these sub-factors, which would even approach mathematical precision, clearly appears from the following record-supported excerpt from the opinion of the court below: "The first mining in the Mammoth Vein on this property was done in the period between 1860 and 1870. No records or maps of that mining operation are in existence or at least no such records were available at the time of the trial. It is impossible and has been impossible for many years to make any survey of the area containing the Mammoth Vein for the reason that there have been falls of top rock and coal, closing the gangways and passageways in the mine, the methods employed in mining the remaining coal of the Mammoth Vein in this area being by means of rock holes cut from the lower levels and by stripping or surface mining from the outside. Consequently, the Mammoth Vein has never been exposed sufficiently to enable any absolute measurements to be made. The estimate of the thickness of the Vein, as fixed by the appellant's witnesses is by judgment obtained from their experience in mining the Vein upon the property. The appellee's witnesses fixed their opinion as to the thickness of the Mammoth Vein from geological surveys of the area and historical data gained from publications printed by early mining engineers who operated in this area. They further base their opinion upon a cross section of the Mammoth Vein obtained from the records of the appellant company produced at the time of the trial, which indicates a thickness of the Mammoth Vein of thirty feet or more. As to this map or cross-section of the appellant, the explanation is offered that the cross-section does not depict an accurate representation of the Mammoth Vein for the reason that they were unable to accurately measure the Mammoth Vein and that the representation upon the cross-section is merely a sketch, as one of their witnesses stated, to complete the

picture or to show or indicate the top of the Mammoth Vein, the cross-section in question showing, however, an accurate measurement of the lower Veins. Similarly, there is no accurate method of determining the percentage of coal removed from the Mammoth Vein in first mining, since there are no records of the early mining done. In addition, there were differences of opinion expressed by the respective witnesses for the appellant and the appellee: as to the percentage of coal in place which can be mined and recovered and as to percentage of recoverable coal which can be marketed after removal and preparation; not as widely divergent, however, as the various estimates quoted and referred to above. For the reasons given, therefore, the various estimates of value for the years in question as well as the estimates given of the marketable tons of coal contained in the property are irreconcilable."

In approaching the problem of a just assessment of coal lands, it should be borne in mind what Justice ELKIN, speaking for this court, said in *Philadelphia & Reading Coal & Iron Co., Appellant, v. Northumberland County Commissioners*, 229 Pa. 460, 471, 79 A. 109: "It is impossible to reduce to a scientific basis and to mathematical precision the elements of value entering into the present selling price of a tract of coal land. Common sense and practical every day business experience are the best guides for those intrusted with the administration of tax laws. Taxation is a practical and not a scientific problem. The question is not what earning or productive power coal lands may develop in the future but what they are actually worth on the market at present. This is the lawful method of valuation for taxation purposes."

The principles of law which are controlling in this case are as follows: (1) The value of a property for purposes of assessment is market value and that is defined as "the price which a purchaser willing but not obliged to buy, would pay an owner, willing but not obliged to

sell, taking into consideration all uses to which the property is adapted and might in reason be applied": *Lehigh & Wilkes-Barre C. Co's Assessment,* 298 Pa. 294, 300, 148 A. 301. (2) If the evidence shows recent bona fide sales of the tracts under consideration, or of tracts similarly situated in the neighborhood and of like quality, the general selling price thus established would be the market value, but if no such evidence is available "the market value may be established by the testimony of persons acquainted with the property, and whose knowledge and experience qualify them to form an intelligent judgment as to its proper valuation.": *P. & R. Coal & Iron Co. v. Northumberland County Commissioners,* 229 Pa. 460, 467, 79 A. 109. (3) Where there are no sales of like properties to furnish proof of market value "all relevent elements tending to appreciate or depreciate value are admissible. In such cases it is proper "to adduce evidence upon all matters affecting probable selling price and any other element of value that would influence the mind of a purchaser.": *Hudson Coal Company's Appeal,* 327 Pa. 247, 193 A. 8. (4) While it is our duty to pass upon the findings of fact and conclusions of law of the court below, such findings will not be disturbed unless there is clear error in the ultimate determination. (*Phila. & Reading Coal & Iron Co. v. Commissioners of Northumberland County,* 323 Pa. 185, 186 A. 105) (5) If the conclusions of the court below are in whole or in part based on impractical considerations or, conversely, *if the court below fails to give any weight or due weight to a practical consideration relevant to the issue trying,* it is our duty to reverse or appropriately modify its decree. This fifth principle is not only sound in reason but it is in harmony with what this court said in (a) *P. & R. C. & I. Co. v. Northumberland County Commissioners,* 229 Pa. 460, 470, 79 A. 109, and (b) in *Lehigh Navigation Company's Appeal,* 327 Pa. 327, 334, 193 A. 50.

The differences in the estimates of the opposing witnesses as to the amount of marketable coal in this

property on the assessment dates were correctly characterized by the court below as "irreconcilable". It is obvious that the court did not wholly accept any witness' estimate. It is not likely that the witnesses themselves would claim that their respective calculations based on so many uncertain factors made a very close approach to exactitude.

Appellant insists that its witnesses were "more competent, better qualified and more experienced, with far greater knowledge of the subject matter", that their sources of knowledge" were "more reliable" and that therefore their testimony "was entitled to much greater weight than the testimony of the County's witnesses.[2]

[2] The Company's witnesses were (1) James H. Pierce, mining engineer, Lehigh University graduate in 1910, who had served as chief engineer and consultant and in various executive capacities such as president and manager of several anthracite coal companies and who has had extensive experience in valuing anthracite coal lands in Schuylkill County and elsewhere. In 1933 he was appointed by General Hugh S. Johnson, as his Technical Advisor to the N. R. A., having charge of everything pertaining to coal mining in *twenty-three states*. At the time of the trial of this case he was the president and director of several anthracite coal companies. (2) A. B. Jessup, mining engineer for several coal companies, Lehigh University graduate in 1896, who had served as vice-president and general manager for 25 years of the G. B. Markle & Co., Pa. anthracite coal operators. He was also vice-president of the Jeddo-Highland Coal Co., which acquired the stock of the Hazle Brook Coal Co., operating five collieries in Schuylkill and adjacent counties. He also had extensive experience in the valuation of coal lands. At the time of this trial he was a trustee of the Scranton Coal Company "which [he stated] was in bankruptcy under 77B." (3) Harry W. Montz, a graduate in 1907 from the School of Mines of Pennsylvania State College. He was mining engineer and superintendent for various anthracite coal companies, and served as assistant general manager in charge of the coal mining operations of Coxe Bros & Co. "in the Hazleton region". At the time of this trial he was chief mining engineer of the Lehigh Valley Coal Co. He had experience in the coal basin in which the property in question is situated. The County's witnesses were (1) Arthur Williams, mining engineer, who started his career as a transitman, making surveys of coal collieries. He became a division mining engineer for a coal company and in 1927 he was made superintendent of certain anthracite collieries of the P. & R. C. & I.

The credibility and weight to be given the testimony of any competent witness is for the trier of the facts, for he sees the witnesses and observes the manner of their testifying. Of course, if the conclusion reached by the trier "is flagrantly contrary to the evidence and the court is convinced that an injustice has been done it will and should set" the finding "aside, . . .": 2 R. C. L. sec. 167, p. 197.

No assignment of error is based on the court's over-ruling of appellant's objections to the competency of the County's witnesses. Therefore, it must be adjudged that each litigant supported its case by fit witnesses. As to the *weight* of testimony, there has never yet been devised a mechanism for its infallible measuring. On the *first decisive factor* in this case we do not find that the court placed undue weight, as charged, upon the testimony of the witnesses of either party nor can we

---

Co. and served as such until 1930. For the years 1931 and 1932 he acted as special engineer for the same company on cost analysis. From 1933 to 1936 he was employed by the County Commissioners of Schuylkill County to study the coal lands in that County and place a market value upon the same. He was again so retained in 1937. (2) W. S. Pugh, graduate of Pottsville High School in 1888 and he took a course in mining engineering with the I. C. S. of Scranton and served as mining engineer for coal companies in Schuylkill and adjacent counties. He was employed in 1921 by the P. & R. C. & I. Co. to study coal lands in Schuylkill County. He served many other coal companies as examiner of anthracite coal properties for the purpose of ascertaining their coal content. At the time of this trial and for two years previously thereto he was mining engineer for Schuylkill County. (3) Thomas J. Lewis who "started on the en-gineering corps of the Lehigh Valley Coal Co." In 1917 he was assist-ant mining engineer and in 1919 mining engineer for Madeira-Haill and company's interests. This later position he held until 1937. During the period of that employment he investigated coal properties and took an active part in tax matters. He prospected coal lands in Schuylkill County and appraised many anthracite coal properties. At the time of this trial he represented the Girard Trust Company and others in Schuylkill County. He was familiar with the Yorktown property adjoining the property in question and of the Raven Run property. All the witnesses on both sides had some familiarity with the sales of coal properties.

after reviewing this record of 1,920 pages say that there is clear error in the court's determination.

Appellant also complains that the assessment for 1937 was based on a 10 to 6 ratio between market and assessed values; it contends that it should have been 10 to 4 as formerly. It says: In 1937 "the Commissioners by resolution determined that there had been a uniform decrease of thirty three and one third per cent in market values of all property in Schuylkill County", after "the 1934 assessment figures were placed upon the books as the assessed valuation of all property for 1937 in the County." After a Commissioner had testified on this point, appellant's counsel said to appellee's counsel: "Do I understand . . . that your position is that the figures, . . . remain the same, but by this resolution they [the assessed valuations] became sixty per cent of the market value instead of forty?" The reply was: "That is right." This meant that if a property was assessed at $1,800 in 1937, the same as it had been in 1934, the market value of the property had shrunk in three years from $4,500 to $3,000 and the property was assessed at sixty per cent of the latter valuation. If taxpayers in and after 1937 objected that their properties had in the face of declining real estate values been over-assessed the Commissioners sitting as a Board of Revision of Taxes had put themselves in a position to meet this objection by raising the *ratio* between market and assessed values as indicated.

The Board of Revision of Schuylkill County is the tribunal authorized by law to "revise, raise and equalize the valuation of all property" subject to taxation in that county.: Act of May 22, 1933, P. L. 853 sec. 505, 72 PS 5020-505. The estimated or actual selling price of a property is not controlling upon those whose duty it is to assess properties, but "such selling price . . . shall be subject to revision by increase or decrease to accomplish equalization with other similar property within the taxing district.": Act of May 16, 1939, P. L. 143,

amending sec. 402 of Act of May 22, 1933, P. L. 853, 72 PS 5020-402. If the Board of Revision "accomplished" *in*equality of valuation between appellant's property and any other similar property within the county, by applying to the former a *higher ratio* between market value and assessed value than it applied to the latter, appellant should have shown that fact. This it did not do.

Appellant also complains because the court in fixing the valuation for 1937 valued *separately* the improvements and the acreage. It says: "Witnesses on both sides concede that the improvements without the coal are practically valueless and that the coal . . . without colliery buildings is of little value, and therefore included the value of the buildings and outside improvements in their estimate of the value of the coal lands themselves. We think this the proper way in which the assessment should be made. . . ." This *is* the better way to assess a colliery, but no error can be predicated on the separation of these assessments. At the trial, the assessment for 1937 was offered in evidence, the court considered it and reached its conclusion. We will treat the two separate figures as unified, to wit: $826,400.

Appellant contends that the court erred in refusing to allow appellant to show "that the assessment on its Kline Township coal property remained the same from 1925 to 1930, inclusive (a period of six years), notwithstanding the removal of about two million tons of coal which under the testimony of County's witnesses constituted over twenty per cent of the coal in the property as of 1925." It says: "We submit that this was an improper rejection of testimony, of course not admissible for the purpose of showing that any one of the assessments was correct, but admissible, we think, on several other grounds: (a) the purpose of showing that no consideration as required by Statute had been given to the fact that the property had been partially depleted; (b) as a declaration against interest, and therefore rebutting the prima facie of the assessment; (c) as the history of the

assessments on this property in Schuylkill County." If counsel had thus stated the legal purpose of his offer, the evidence would have been receivable. His offer was as follows: "I want to offer the assessments of the lands involved in this appeal, for the years 1925 and 1928, at $591,425, for both triennial years, for the purpose of showing that there was no deduction made for mined out coal in the intervening years." The offer was properly rejected for the assessment of 1928 was not the issue trying.

The County submits calculations and conclusions as to the value of the tract in controversy based upon the sale of the Raven Run coal tract in 1918 and of the Yorktown coal tract in 1919. The Company challenges these calculations and their bases and rejects their conclusions. It is sufficient to say on this phase of the case that sales of coal tracts in 1918 and 1919, i. e., during the period of and just after the First World War furnish an unreliable basis for calculating the market value of coal lands in 1931, 1934 and 1937. The economic conditions of the anthracite coal business were far different in the first named years than in these last named years. The Company's witness, A. D. Jessup, testified that "the peak in coal land values was reached between 1920 and 1924." This was not disputed. No sales of coal lands forming a basis for comparison with the lands now in controversy were made within ten or twelve years prior to 1931.

In its brief the County asks us to consider the values fixed by this court on coal lands during the last dozen years and to compare these with the values fixed by the lower court in this case. This we cannot do. These valuations were not considered by any witnesses in this case or by the court below. To make these other valuations relevant to the issue here it would have to be shown that all the factors in the problem were practically the same. These other assessments were not offered in evidence, and if they had been we would have a perfect example of

clouding and protracting a case with collateral issues. This practice we condemned in our opinion in the recent case of *Ferreira et al. v. Boro. of Wilson,* filed May 11, 1942, where we quoted Justice Holmes to the effect that the objection "to the introduction of collateral issues is a purely practical one—a concession to the shortness of life."

Appellant also complains of the refusal of the court below to show by way of rebuttal the removal of coal in the Mammoth vein as measured by planimeter. The purpose was to rebut the testimony of the County's three witnesses that they planimetered eighteen acres in this vein upon this property and upon it they based their opinion of thirty per cent original removal and of witness Lewis that the figures he gave after planimetering showed openings. The court upon objection held this to be not rebuttal. Witness Pierce for the appellant had stated in cross-examination (early in the trial) that he came to the conclusion that forty-five per cent of the coal in the Mammoth Vein had been removed by first mining and he then answered "yes" to the following questions: "Was that figure arrived at as a result of the same type of examination of the maps and planimetering of the maps?" He later added: "The breasts and the breasts headings were all planimetered." Appellant contends that "with the close of County's case, the record remained with an opinion of thirty and fifty per cent removed in Mammoth Vein in first mining and thus deduced by planimetering eighteen acres or sixteen and two thirds of the whole. The appellant desired to show that by planimetering 112.72 acres, which included appellee's area, or 78% of the whole, 58.6% was indicated as actually removed, or 8.6% more than witness Lewis' estimate and 28.6% more than the other two appellee's witnesses." Since appellant in its brief admits that "the maps at the time of the mining [in the Mammoth Vein] were inaccurate", we fail to see the value of any evidence obtained by planimetering them. As to rebuttal, "the usual rule will ex-

clude *all evidence which has not been made necessary by the opponent's case in reply."*: Wigmore on Evidence, 3rd. ed., Vol. 6, sec. 1873. Chief Justice SHAW in *Cushing v. Billings,* 2 Cush. 158, 159, said: "The orderly course of proceeding requires that the party whose business it is to go forward should bring out the strength of his proof in the first instance." See Henry's Pennsylvania Trial Evidence, 3rd. ed., p. 647. The court's ruling was not error.

As to the other factors on which this decision rests, the court below gave but little consideration to the second and none to the third. On the economic phases of this case all the court said was the following: "With respect to the economic conditions existing in the anthracite coal trade in the years in question, we find that the annual sales and net tons for the year 1930 was 64,346,491 tons, for the year 1933, 46,584,961 tons and for the year 1936, 51,874,887 tons. During the same years, we find an increase in the sale of oil, gas, coke and other anthracite substitutes. The increase, however, is not in direct proportion to the decrease in the sales of anthracite shown for the respective years, which would indicate that while it was undoubtedly true that in this period the substitutes used replaced the use of anthracite, yet the total increase in the substitutes is not reflected directly in the decreased sales of anthracite. We find that in the year 1930 the average value for the net ton of coal, taking the entire anthracite industry as a whole, was $4.98, for the year 1933, $4.05, and for the year 1936, $3.92. The average number of working days for the industry in 1930 was 208 days, in 1933, 182 days, and in 1936, 192 days. The average sales realization per net ton for the year 1930 was $5.39, for the year 1933, $4.36, and for the year 1936, $4.31. . . ." The foregoing excerpt is a totally inadequate picture of the economic plight of the anthracite coal industry during the years when the challenged assessments were made, to wit: 1931, 1934 and 1937. The opinion states no conclusion

whatsoever as to the effect of factors two and three on the value of coal lands.

The deteriorating economic status of the anthracite coal industry is a matter of common knowledge; it has been declared and discussed in official publications of the federal and state governments and has been recognized in opinions of this court during the past thirteen years.[3] On February 8, 1937, this status impelled this Commonwealth to create the Anthracite Coal Industry Commission to make "a thorough study and investigation of the economic and social conditions in the anthracite coal region of this Commonwealth, the causes underlying the present dislocation of the anthracite coal mining industry, the extent of illegal mining and the causes therefor, the methods and means by which the existing economic and social conditions in said district may be alleviated or remedied, and such other matters and affairs as may be deemed pertinent . . ." (See 1937 P. L. p. 21)

This record contains pages of uncontradicted testimony showing the decline of the anthracite industry during the 1930 decade. In 1926 the anthracite industry realized from the sale of its product $466,480,000; in 1933, $203,106,000; in 1936, $223,335,521. In Schuylkill County the decline in sales was from $100,577,000 in 1926 to $38,347,759 in 1933; and $49,597,701 in 1936. In 1926 the industry realized from the sale of its coal $5.98 per ton; in 1933 $4.36 per ton; and in 1936 $4.31 per ton.

The following table based on the record shows the decline in anthracite "sales production" for the years indicated.

| | | |
|---|---|---|
| 1926 | 78,006,231 | net tons |
| 1930 | 64,346,491 | " " |
| 1933 | 46,585,000 | " " |
| 1936 | 51,874,887 | " " |

[3] Lehigh & Wilkes-Barre Coal Company's Assessment, (1929) supra. Hudson Coal Company's Appeal (1937) supra.

In 1926 the working capital of the industry was $111,-097,223; in 1933 it was $16,494,228, and in 1936, $8,-860,217. In 1926 the industry had a profit of 50 cents per net ton; in 1930, 24 cents and in 1933, the industry lost 19.5 cents per ton. In 1936 the industry lost 2 cents per ton. In 1926 the industry employed 165,386 men and ten years later 102,081 men. In 1926 the industry averaged 244 working days and ten years later 192. In 1926 the production of competitive fuels (excluding bituminous coal) was the equivalent of 17,000,000 tons of anthracite coal; in 1936, it was 47,000,000.

The United States Department of Interior Minerals Yearbook for 1938 in its chapter on "Pennsylvania Anthracite" declared, inter alia, under the heading: "Review of 1937", the following (p. 747) : "Production and prices declined and the use of competitive fuels apparently increased." (It did say also that "there were certain encouraging developments during 1937, among these being "the efforts of Anthracite Industry, Inc. to popularize the use of anthracite", which efforts were broadened and increased", and "legislation designed to restrict the sale of coal trucked from illicit mines was adopted in several states.) It also said (p. 755) : "Competitive coke, fuel, oil and gas has been keenly felt by the anthracite industry." Its table 4 showed a *decrease* in the use of anthracite coal in New England, New York, New Jersey, Pennsylvania, Delaware, Maryland, and the District of Columbia from 57,564,000 net tons in *1929* to 45,967,000 net tons in *1936* and an increase in oil for heating and range purposes in the same areas in the same period of 4,457,000 net tons to 19,751,000 net tons ("converted to coal equivalent on the basis of 4 barrels of oil equaling 1 ton of coal".) The use of coke for the same purpose more than doubled in the same time in the same area. The same Yearbook states (p. 756) that "imports of anthracite gained [in 1936] 27% over 1929; and (p. 752) "the average value of all anthracite produced [in Pennsylvania] in 1937 dropped to $3.81 per

ton, 35 cents below 1936, and the aggregate value at plant fell to $197,599,000, the lowest figure since 1915. It also said (p. 756) : "Consumption of the solid fuels mentioned and of the fuel oils, in terms of coal, increased from 65,075,000 tons in 1929 to 71,704,000 in 1936 (10 per cent). Of these totals, the share of anthracite dropped from 89 per cent to 64 percent, that of coke rose from 4 to 7 percent, and that of fuel oils jumped from 7 to 28 percent."

That such facts as the foregoing would diminish the attractiveness of coal lands as an investment [4] to a prospective purchaser in 1931, 1934 and 1937, "willing but not obliged to buy", and therefore would have a very adverse effect on their market value is self evident.

The third factor, "bootleg mining", was ignored by the court below and by the witnesses for the County. The Company's witness, Pierce, testified that the bootlegging of coal ("an economic factor peculiar to the County" of Schuylkill) "had a very serious effect on the industry as a whole, it was much more serious on the Schuylkill County operator, and on the value of his property than on the operators of the Northern Field; it depressed the price of coal from the legitimate mine, and reduced the tonnage from them, and the working time and so forth." He stated that bootlegging of coal was "on the increase in the period [1931 to 1934] we are discussing". He expressed the opinion that "the effect of all of these [economic factors] on the value of coal

---

[4] Witness Pierce when testifying in relation to the 1937 assessment, said that in that year "the Glen Alden and Lehigh and Wilkes-Barre Coal Companies combined produced approximately seven and one-half million tons per year against a former production of about thirteen million. The earnings have gone off from between nine and ten dollars per share to about seventy-seven cents a share." He said the companies paid annual dividends of nine dollars "for a number of years before this assessment". He "could not tell when was the last year that it paid nine dollars". When asked: "1929, wasn't it?" he replied: "Before that. I say it was pretty ancient at the time. I do not know exactly when."

lands generally in Schuylkill County between January 1, 1931, and January 1, 1934," was a "decline in values between twenty five and thirty per cent."

The unhindered appropriation by trespassers of an owner's property in coal lands has a plainly prejudicial effect on the value of such lands in the county where such practices are tolerated and condoned.[5] It requires

---

[5] "It is believed that between 12 thousand and 14 thousand men are now more or less regularly engaged during the winter months in mining coal illegally. . . . In addition, about 6 thousand men and boys are engaged in breaking the stolen coal, in trucking it, and in distributing it to markets as far away as Baltimore and southern New England. The quantity sold in 1933 and 1936 has been estimated at around 4 million tons a year, with a sales value of above $30,-000,000 a year. This tonnage is equal to roughly 8% of the present output of the legal mines, and has undeniably cut heavily into the markets of the legal mines themselves. . . . In a good many places the bootleg mining has imperiled adjacent legal mines, or has made adjacent coal unworkable, or has endangered surface structures and roads. The bootleggers pay no royalties, no property taxes, and make no provision for compensation in case of accident. There is no dispute on the legal standing of bootlegging. The bootleg miners are trespassers and are stealing property, and the bootleg breakers and truckers are handling stolen goods. . . . Efforts to stop bootlegging in the Schuylkill fields by resort to the ordinary legal processes have thus far been almost wholly unsuccessful, except where surface buildings and roads or the operation of adjacent legal mines were in immediate danger. . . .": From "AD INTERIM REPORT" of Chairman W. Jett. Lauck and Commissioner James W. Angell of the Anthracite Coal Industry Commission of Pennsylvania, (See Act of February 8, 1937), under date of May 15, 1937.

"According to a survey by the Anthracite Emergency Committee, as of March 15, 1941, 10,031 men and boys were working in 2,862 'bootleg' openings. In addition to these workers, 1,697 men and boys were working in 340 breakers and washeries preparing the product for the market. The survey revealed that free-lance miners produced 635,556 tons of anthracite in January 1941. According to the Anthracite Institute, the illicit production for 1940 was more than 4,000,000 net tons.": From the chapter entitled "Pennsylvania Anthracite" in the United States Department of the Interior Minerals Yearbook Review of 1940, at p. 824.

On July 1, 1942, the State Secretary of Commerce reported that the number of *active* bootleg mine openings is 1,869. There were also several hundred *"inactive* bootleg holes".

no argument to prove that when any kind of property, whether coal lands or apple orchards or potato patches, is no longer legally protected in any county or community there are not likely to be many prospective purchasers for it and there will be a great shrinkage in its market value. *The first duty of government is to govern,* i. e. to maintain law and order, at all hazards and regardless of expense. Only by so doing can it fulfill its legitimate function, which is the protection of *life, liberty* and *property.* Cooley in his Constitutional Limitations, 8th ed., Vol. 2, p. 733, says: "The protection of the subject in the free enjoyment of his life, his liberty, and his property, . . . was guaranteed by the twenty-ninth chapter of Magna Charta, 'which alone,' says Sir William Blackstone, 'would have merited the title that it bears of the *Great* Charter.' . . . this guaranty as a principle of constitutional protection is to be found in each of the State constitutions; . . . and . . . in the Constitution of the United States."

Whether or not there is any bootlegging of coal on the lands whose assessment is the subject of this adjudication does not appear. In this case we are not concerned with this illegal practice *on any particular tract.* The important fact here is that coal properties *in the county* in which appellant's coal lands are situated are spoliated to the extent of 3,000,000 or more tons of coal annually. This coal costs those who take it nothing except their efforts to get it and sell it; they pay no taxes on either the real property invaded or the personal property taken and carried away. The coal thus illegally possessed and marketed enters into competition with the coal mined and marketed by those who bought and paid for coal land and from whom large sums of money are exacted annually as taxes for the support of government. We said in *Commonwealth v. American Dredging Company,* 122 Pa. 386, 391, 15 A. 443: "Legal protection and taxation are reciprocal." That the above described conditions prevailing in the County of Schuylkill during the past

decade depreciated substantially the value of coal lands in that county is a fact which commands judicial recognition.

At the time of the 1931 assessment "coal bootlegging" was in its infancy and had probably not then made its impact on the value of coal lands; therefore, we will not hold it to be a factor in the 1931 assessment. Because of the *general economic condition* of the anthracite coal industry in 1931, a factor not given *due* weight by the court below, we will reduce the valuation made for the triennial assessment for that year, fifteen per cent; and because of the *additional factor of the bootleg mining of coal* above discussed, a factor given *no* weight below, we will reduce the valuation made for the triennial assessments of 1934 and 1937 an additional fifteen per cent, making a total reduction for each of these latter two trienniums of thirty per cent from the figure fixed by the court below.

The market value and the value for purpose of assessment of the anthracite coal properties of the Glen Alden Coal Company, situated in Kline Township, Schuylkill County, Pennsylvania, for the respective triennial years 1931-1933, 1934-1936, 1937-1939, are fixed by us as indicated in the accompanying table:

| Years | Market Value | Per Acre | Assessment Value (ratio 10 to 4) | Per Acre |
|---|---|---|---|---|
| 1931-33 | $1,103,512.50 | $1912.50[6] | $441,405 | $765.00 |
| 1934-36 | 767,410.00 | 1330.00[6] | 306,964 | 532.00 |
| | | | (ratio 10 to 6) | |
| 1937-39 | 578,480.00 | 1002.56[6] | 347,088 | 601.53 |

The decree of the court below is modified so as to be in conformity with this opinion; the record is remitted

[6] The court below fixed the market value per acre for the three respective trienniums as follows: $2250, $1900. and $1200. The last figure, i. e. for 1937, was based only on coal values; the breaker and other structural improvements being seperately valued at $134,000. Allocating this sum to the acreage, results in increasing the per acre market value by $232.23, making the total per acre market value for the 1937 triennium *as fixed by the court below*, $1432.23.

to the court below so that the decree as thus modified may be put into effect. Costs to be divided equally between appellant and appellee.