## Brone Estate

*Isadore Rapoport*, for estate.

*Robert H. Jordan*, for Commonwealth.

GEARHART, P. J., June 15, 1956.— . . . Simon S. Brone died June 15, 1955, owning an undivided one-half interest in premises 1616 Chestnut Street, Philadelphia. Under the will of his wife, Fay R. Brone, he had a life interest in the other half. The Commonwealth's appraiser valued each half interest at $95,000 and it was from this appraisement that the parties have taken the appeals. An extensive hearing was held in the matter. At the conclusion of the hearing with the testimony of the witnesses fresh in mind, the court found as a fact that the fair and conscionable value for the undivided one-half interest in premises 1616 Chestnut Street, Philadelphia, as of date of June 15, 1955, was $73,000 and directed the register of wills to modify the appraisement accordingly. Exceptions were filed to this decree and the matter came before the court on argument on June 7, 1956.

This is the second time that the question of the fair valuation of the real estate in question was before the court. When Mrs. Brone died on September 23, 1952, her undivided interest in the property was fixed by this court at $66,000 following appeal from the transfer inheritance tax appraisement.

The basic act dealing with transfer inheritance tax is the Transfer Inheritance Tax Act of June 20, 1919, P. L. 521. The act has been amended a number of times. Under the act it is the duty of the appraiser to make a fair and conscionable appraisement of the estate: Article II, sec. 10, of the Transfer Inheritance Tax Act of June 20, 1919, P. L. 521, 72 PS §2321.

The Commonwealth makes out a prima facie case by the introduction into evidence of the appraisement on appeal, and the burden is upon appellant to show that the appraisal is unfair and unconscionable: Clabby's Estate, 308 Pa. 287, 291; DuBois' Appeal, 293 Pa. 186; Appeal of Penna. Co. for Insurance on Lives and Granting Annuities, 282 Pa. 69. The valuation to be placed on the real estate of decedent, subject to the transfer inheritance tax, is as of the date of the death of decedent: Clabby's Estate, supra, 287; Handley's Estate, 181 Pa. 339; Lines' Estate, 155 Pa. 378.

In determining the fair value of the property appraised, it is proper to take into consideration the selling price of property in the neighborhood: Smith's Estate (No. 1), 261 Pa. 51. And it has also been held in the same case: "While the price property would bring at public sale is a proper criterion of value, it does not necessarily follow that such standard is the only evidence to be considered in determining the 'clear value' for the purpose of assessment of collateral inheritance tax, nor is the appraiser prevented from taking into consideration other evidence tending to legitimately affect the value of the land."

And it has been held in Clabby's Estate, supra, 287, that appeals from transfer inheritance taxes are analogous to appeals from the action of the county commissioners.

The Transfer Inheritance Tax Act, 72 PS §2302, provides in part that: "All taxes imposed by this act shall be imposed upon the clear value of the property

subject to the tax. . . ." It is to be observed that the statute contains no express provision as to the basis' adopted for determining the clear value or as to the manner to be pursued by the appraiser in arriving at the amount he considers to be a fair valuation.

While a public sale of property is a proper criterion of value, it is not the only standard to be considered in determining the fair value. The appraiser and the . court should take into consideration other evidence tending to legitimately affect the value of the land: Webster's Estate, 314 Pa. 233.

Clear value, it would seem, would be the fair market value of the property at the time of decedent's death. In Lehigh & Wilkes-Barre Coal Co.'s Assessment, Glen Alden Coal Co.'s Assessment, 298 Pa. 294, 300, it was stated: "Ordinarily, by 'fair market value' is meant the price which a purchaser, willing but not obliged to buy, would pay an owner, willing but not obliged to sell, taking into consideration all uses to which the property is adapted and might in reason be applied." The various elements of market value have been set forth in a number of cases: Edmonds' Appeal, 314 Pa. 382; Westbury Apartments, Inc., Appeal, 314 Pa. 130; American Academy of Music Appeal, 321 Pa. 433. And it has been held that a previous sale of the property has a substantial bearing on the question of market value: Edmonds' Appeal, supra, 384.

With these principles in mind, we approach the solution of the problem. It goes without saying that considerable of the evidence submitted in cases of this type is raised on the testimony of expert witnesses. It is opinion evidence and therefore honest men may differ as to the fair valuation of property. This is illustrated in this case and practically every case involving the question of valuation of real estate. It follows that any appraisement made is not infallible and that it is impossible to ascertain the fair and mar-

ketable value of real estate with mathematical exactness. It must of necessity rest on the conclusion of the fact-finding body, and of course this conclusion should rest on the relevant factors that go to make up the fair market value. It is in this spirit that we have approached the problem.

The property in question is a four-story building with a basement with wooden flooring and plaster walls. It covers the full lot of 20 feet frontage and 145 feet depth from Chestnut Street to Ionic Street, Philadelphia. The building is leased to the Singer Sewing Machine Company, which occupies the first floor for display and sales purposes. The basement and second floor are partially used by the tenant, and the third and fourth floors are vacant. The first floor was recently renovated by the tenant for its purposes, but the remaining upper floors are in very poor condition. The property is under lease which does not expire until February 28, 1963. That is to say, at the death of Simon S. Brone the lease had approximately eight years to run. The rent from the property yields a net income after the payment of taxes, fire and rent insurance, agents' commissions and repairs, of $9,230.21.

At the hearing appellant produced two real estate experts in the persons of Benjamin A. Strouse and Harry A. Haeberle. The Commonwealth offered one real estate expert, Harold B. Hess, and the inheritance tax appraiser, Louis Silverman. Mr. Strouse impressed the court as the witness most familiar with the property in question. His firm has been the agent in charge of the building and has been employed for some years by the Brones to manage the property. The court, in considering his testimony, was not unmindful of the fact that he was in the employ of the estate. Notwithstanding this, Mr. Strouse impressed the court as a credible, truthful and reliable witness. He answered the questions directed to him in a fair and unbiased manner.

Mr. Strouse testified that his firm has been trying to sell this property since August 1955 and the best offer was $145,000. He testified that the Philadelphia municipal assessments are equivalent to market values. This would fix the market value of the property at $147,000, or $73,500 for the one-half interest, without allowing a discount because of the one-half interest involved in both estates. The testimony shows that there was a sale of a property on November 23, 1952, at 1730 Chestnut Street. However, this sale occurred almost three years before the death of this decedent. Mr. Strouse testified to a number of sales of properties in the neighborhood in recent years.

The Commonwealth stresses the fact that property 1624 Chestnut Street, located about four doors from the property in question, sold in December 1955 for $175,000. With respect to this property Mr. Strouse testified that the property was in considerably better condition than the property in question, and in addition was sold to a user, not an investor, which, of course, would make a substantial difference.

The conclusion of Mr. Strouse was that the value of $73,000 for the one-half interest in the property would be fair and reasonable. He did express the opinion that his clients would probably accept an offer of $150,000 for the property; however, none has been received.

The Commonwealth stresses the fact that the tenant expended $8,000 to improve the property. Taking this into consideration, Mr. Haeberle opined that the improvements were primarily for the benefit of the tenant and not the landlord and therefore resulted only in a slight increase in the value of the building. His opinion was that the fair market value at the date of decedent's death was $140,000.

All of the witnesses admitted that generally a 5 to 10 percent discount should be allowed where an un-

divided interest in a property is appraised; this for the reason that the average buyer does not care to purchase an undivided interest and probably face partition proceedings or other litigation. In Smith's Estate, supra, because of unusual circumstances an allowance of a 25 percent reduction was allowed by the court.

It appears that the opinion of both the Commonwealth witnesses was that the property should be appraised at the highest value that it might possibly bring under the most favorable circumstances. Mr. Hess testified among other things that the best and highest value of the property would be for a user-buyer. This was a most unrealistic approach, for the reason that at the death of decedent the property was leased. The lease had approximately eight years to run. The only possible user-buyer would be the lessee, the Singer Sewing Machine Company. It is patent that a user-buyer would not likely buy a property if he had to wait eight years to get possession. When this was called to Mr. Hess's attention and it was pointed out to him that practically the only buyer would be for an investment purpose, he agreed that the value of the property "would be pretty close to what the other gentlemen testified".

Mr. Silverman, the inheritance tax appraiser, also approached the problem in what we deem a most unrealistic manner. He applied a theoretical formula which entirely disregarded the practical value of the property at the death of decedent. This testimony to a great extent was of a speculative nature in estimating what the property would be worth at the end of seven years and then translating that future value into present worth. He refused to consider the property only from an investment angle and continually emphasized the user-buyer, which, in the face of the facts, was most unrealistic in our judgment.

It was pointed out by Mr. Strouse and Mr. Haeberle that in view of the long-term lease, the property is probably only salable to an investor and that an investor would expect a net return of six and one half to seven percent or more. This we can readily understand. An investor would naturally be speculating on what he thought the property would bring six or seven years from now. In view of the shift that has been taking place in central business properties throughout the cities of this Nation, and with the rapid changes that are taking place in commercial enterprises, it is understandable that present-day values of business properties might fluctuate severely. Of course, it is mere conjecture to contend that this property will increase or decrease in the next six or seven years. However, it is true that a present buyer of the property would be speculating as to future values. Naturally, in order to compensate him for this risk, the buyer would demand a high rate of interest.

The net yield of the property is roughly $9,200 per annum, and to yield seven percent it would justify an investment of $133,000. On the court's finding that $146,000 was a fair valuation, the net return on this property would be approximately six and one third percent. This, considering the speculative nature of the property, would not be a large return.

It should be stated that the court in arriving at the amount of $146,000 took into consideration that this estate and the Fay R. Brone estate each hold an undivided one-half interest. We allowed a five percent differential for this element. The Commonwealth contends that since the parties representing the undivided interest seem to be in accord, that this discount should not be employed. The answer to that is that presently it is a fortuitous circumstance that the parties are in accord. A difference could arise at any moment, and in any event what we are appraising is an undivided

one-half interest. We think the five percent differential should be allowed.

Finally, the court is of the opinion, considering all of the evidence as well as the arguments presented on exceptions, that $73,000 is a fair and conscionable valuation for each undivided one-half interest in the premises as of the date of decedent's death. We reaffirm our finding as indicated in the decree of April 26, 1956.