## Development Company of America, Inc.
## v. Board of Revision of Taxes of Philadelphia

*John M. Phelan of Morgan, Lewis & Bockius,* for taxpqyer.

*Martin Weinberg,* City Solicitor and *John J. Pettit, Jr.,* Assistant City Solicitor, for City of Philadelphia and School District of Philadelphia.

RIBNER, J., October 27, 1972.—After the Board of Revision of Taxes refused to sustain an appeal from the tax assessment for the years 1971 and 1972 on the property located at 11601 Roosevelt Boulevard and owned by Development Company of America, Inc., petitioner, this appeal was taken to the court of common pleas. The property had been assessed for taxation at a valuation of $4,461,400 for each of the years 1971 and 1972.

The property involved is leased from the petitioner by the Internal Revenue Service. The property is on a tract containing 23.8961 acres. The first section of the building on the tract was built in 1963. The net usable square footage of the building at that time was 250,143 square feet. In 1970, additions were built, bringing the footage up to 432,589 square feet.

Both petitioner and Board of Revision of Taxes

found the building to be highly unusual for the Philadelphia area. The Roosevelt Boulevard property is a one-floor office building, which normally would be used for industrial purposes because of the large footage.

A lease between Development Company of America and the United States Government was signed on June 30, 1970, as a result of the new addition constructed on the property. The lease supplemented an earlier lease entered into by the parties for the original structure constructed in 1963. The lease has a 20-year term with two five-year options. The lease is a gross lease, and, as such, the owner is responsible for all maintenance, repairs, taxes and insurance. However, at the end of five-year periods the government might pay additional rent, which would be calculated as the difference between the rental established in the base year and increases in expenses over any five year period. Thus, for example, if taxes were $100,000 in year one, $125,000 in year two, and so forth up to $200,000 in year five, the government would pay an additional $100,000 rental per year starting in the sixth year to cover the increased tax burden. The tax increases paid in years two through five of the lease would be borne by the lessor. The formula for computing the government's liability for increased operating expenses in year six of the lease is similar to that for taxes, except for the fact that the base year for operating expenses is the average of the first five years rather than year one.

The governing statute as to real estate assessments for counties of the first class reads as follows:

"All property within the county now or hereafter made taxable by law, shall be valued and assessed by the assessors and by the board at the actual value thereof. In determining the actual value of property,

the price at which the same would separately bona fide sell shall be considered but shall not be controlling": Act of June 27, 1939, P. L. 1199, sec. 13, 72 PS §5341.13.

The courts, in considering the statute and other statutes governing assessments, have found the term "actual value" to mean "market value": Park Drive Manor, Inc. Tax Assessment Case, 380 Pa. 134 (1955); Flamingo Apartments, Inc. v. Board of Revision of Taxes, 383 Pa. 223 (1955); Brooks Building Tax Assessment Case, 391 Pa. 94 (1958).

In Lehigh & Wilkes-Barre Coal Co.'s Assessment, 298 Pa. 294 (1929), the term "market value" was defined at page 300:

"Ordinarily, by 'fair market value' is meant the price which a purchaser, willing but not obliged to buy, would pay an owner, willing but not obliged to sell, taking into consideration all uses to which the property is adapted and might in reason be applied . . ."

In Park Drive Manor, Inc. Tax Assessment Case, supra, the court discusses what factors are relevant in determining market value:

"In determining market value many factors may be relevant, including capitalized rental income, comparable sales, location of the property and condition of the buildings: Metropolitan Edison Co.'s Appeal, 307 Pa. 401, 161 A. 303; Algon Realty Company Tax Assessment Appeal, 329 Pa. 321, 198 A. 49; Chestnut Street Tax Assessment Case, 361 Pa. 231, 64 A. 2d 769. But all the elements considered must be directed to determining the value of the property in the market, a determination which is not controlled by any single factor and which is ultimately made on the basis of competent testimony as to what the property is worth in the market at a fair sale: East Pennsylvania Railroad v. Hiester, 40 Pa. 53; American Academy of Music

Appeal, 321 Pa. 433, 184 A. 657; Algon Realty Company Tax Assessment Appeal, supra; Chestnut Street Tax Assessment Case, supra; Berkley v. Jeannette, 373 Pa. 376, 96 A. 2d 118."

In attempting to establish market value, both sides in the case at hand produced expert witnesses. Sidney N. Greenberg, Jr., the witness for petitioner, arrived at a market value for the Roosevelt Boulevard premises by using principally the capitalization of net income approach. Greenberg felt that since the property was encumbered with a 20-year lease, possibly 30 if the options are exercised, that any investor interested in buying the property would analyze the income generated by the property rather than the cost of the building or reproduction cost. Also, Greenberg felt that the comparative value approach would be invalid since he could not find any properties sold that were physically similar to the property in question and that could be used as a basis for comparison.

Greenberg arrived at a fair market value figure of $3,500,000 by applying a 10 percent capitalization rate on an adjusted net income of $350,000. In arriving at the 10 percent capitalization rate, Greenberg considered the prevailing rate of interest on other types of investments, the elements of risk and liquidity and the burdens of management connected with a gross lease.

Greenberg noted that any purchaser of the property would run the burden of increased taxes and operating expenses during each five-year period of the lease. Any additional rent paid by the government after a five-year period, as explained above, could only pay for the difference between the base year and the last year of the period and could not cover the intervening increases. Another factor entering into Greenberg's consideration of a 10 percent rate would be that real estate

has historically a high capitalization rate, since real estate is not readily saleable. Even interest rates on FHA guaranteed mortgages were as high as eight percent during the assessment period. Moreover, Greenberg felt that investors would rather have a property where they received rent without having any of the obligations that come with the gross lease on the Roosevelt Boulevard property.

The board's witness, Louis A. Harrison, viewed the property as having a market value of $6,510,000. Rather than relying solely on the capitalization approach, Harrison took into consideration, when evaluating the property, ". . . the building itself, its location, its construction, occupancy, tenancy, and all the factors which go to make up the value of a piece of real estate."

Harrison stated that he also took into consideration the lease when determining market value, however, only to a limited extent.

"Q. Would you explain to the Court how you obtained the lease and to what extent.

"A. In my mind, this is a lease that was made by a man who wasn't fully conscious of what he was doing. This property rented for around $3.80 a square foot. It is office space with full improvements, full services, and it is about $3 off the standard rate for buildings of this type. After I saw the expenses that the owner was subjected to by making a lease of this type, I thought there was either a tax gadget or some operation which he is trying to take a loss somewhere because with the mortgage on there and the operations, he never could come out even at $1,072,000 rental.

"Q. Now, is this a usual type of lease, Mr. Harrison?

"A. In my opinion, it is the first lease in my fifty years of experience that a man made conscious and

aware of what he was doing. We figured it cost $3 and about thirty cents a square foot to operate a building of this type, and if he is getting $3.80 a square foot for office space, there is no equity of any kind arising out of it, although the figures given to me were originally that the expenses were $724,000, which left a net income of $546,000, and if you deducted $200,000 in taxes, you would have $346,000 left."

While arriving at approximately the same net income figures as Greenberg, namely $346,000, Harrison found a reasonable capitalization rate to be five percent for the Internal Revenue Center, or one-half of the rate suggested by Greenberg. Several factors led Harrison to the five percent figure. Mainly, however, it seems the figure was used since it was in conformance with what Harrison believed to be the value of the building.

"Q. Now, in considering the income approach, you heard Mr. Greenberg testify to a capitalization rate of ten percent.

"Did you determine a capitalization rate for this property?

"A. I capitalized the net return as I found it at five percent. It is a Government lease, there is no risk, and knowing you have to wait two or three years for the renegotiation period. And I don't know what the renegotiation period is in this case, how they work it, because I read the lease, and I don't understand it.

"Q. How did you arrive at the figure of five percent?

"A. It is a Government lease, and I have had leases made with clients who had Government leases, and five and six percent net is a fair figure if you have a long-term lease with them plus this is not the Federal Government. I am doing business with the State, and the State will pay your excess taxes, and you can enter

into a lease with them at five and a half, six percent, and they will pay you much higher than $3.80 a square foot rent for office space.

"This is one of the finest buildings in Philadelphia for office space, and I was really surprised, when I went in there, to see the extent of ten acres of building —ten acres is four hundred some thousand square feet —with everything that an office should have. It has got air conditioning. It has got heating diffusers. It has fluorescent lighting, asphalt tile floors, modern elevators. The building has a beautiful landscaped exterior, parking lot with a twelve-hundred car capacity. It has got everything, and to say that the property has a valuation of much less than this is not conforming with the values.

"Q. Your income approach is, then, pretty much consistent with the cost of the building. Is that correct?

"A. I think so."

In making a final determination as to the tax assessment, this court must agree with the board. Petitioner would like us to believe that the capitalization of expectable net income is the only method to determine the market value of the building in question and furthermore that 10 percent is the proper capitalization rate.

Capitalization of net income is not the only method to be used in establishing the market value of buildings: Park's Appeal, 334 Pa. 193 (1939); Flamingo Apartments, Inc. v. Board of Revision of Taxes, 383 Pa. 223 (1955); Wynne, Inc. Tax Assessment Case, 434 Pa. 59 (1969).

As noted above, Harrison relied on various factors in determining a fair market value. He looked at the fact that the property is comparable to other properties

in the area, and that his figure for the value of the land and building were in harmony with sales in the area.

In attempting to discredit the testimony of Harrison, petitioners point to the fact that Harrison lacked any experience concerning office buildings leased to the government, that Harrison did not understand the contract in question, and that the five percent capitalization rate was not supported by any facts whatsoever.

In the abstract, a five percent capitalization rate might seem incredible or grossly unfair. As petitioners point out, Harrison knew of no other properties capitalized at five percent. Petitioners also presented evidence of sales of properties under long-term leases where the capitalization rate was slightly over 10 percent. Even in what seems to be the leading Pennsylvania cases on the capitalization of net income approach to market value, a 10 percent rate was used: Appeal of Pennsylvania Northern Lights Shoppers City, Inc., 25 Beaver 18 (C.P. Beaver, 1963), affirmed sub nom., Pennsylvania's Northern Lights Shoppers City, Inc. Appeal, 419 Pa. 31 (1965). However, nowhere can we find evidence when looking at these situations that the net income on which the capitalization is based is a result of an improvident contract voluntarily entered into by the parties.

No one can dispute the fact that the lease between petitioner and the government is improvident. Harrison recognized this factor as indicated by the quoted portions of his testimony. He stated that the rental rate which the governmental agency was paying was about $3 per square foot off the standard rate for buildings with comparable services, and furthermore that the party making the lease ". . . wasn't fully conscious of what he was doing."

Scott S. Bair, president of Development Company

of America, in his testimony, added credibility to Harrison's statement.

"Mr. Greenberg told me this morning when he looked at our bid, he said, 'You were stupid.' And people in Government have told us the same thing. We just bid too low."

Bair further testified that when he entered into the leasing agreement he felt it was a good lease but did not have time to examine a rider attached to the lease by the government at the last moment.

"THE WITNESS: You mean did I think it was a good lease?

"MR. PHELAN: Yes.

"THE WITNESS: I did until they attached this rider.

"When they came down here, I got up at five o'clock in the morning, like I did this morning, and came here to Philadelphia. I, at first, refused to sign the lease because of the eleven-page rider. We had no time to study it. I turned to my attorney and said, 'Should I sign this?' He said, 'Well, it is a matter whether you want the building or not.'

"Now, we had the first portion of this building that the Government lease run out on within a couple of years. I didn't know what we were going to do with it. They made the statement—I think it was extreme duress; it was at eight o'clock in the evening; I was very tired; I had had no lunch—they said, 'You are either going to sign this lease tonight, or tomorrow we are going to give it out to somebody else, and you will pay the difference.' This is the statement that was made, and there were three witnesses there. So, in desperation, I signed it. When I got home and read the rider and studied it, I realized I had made a grave mistake."

"A. I was sure we had made a mistake after we exe-

cuted it. In other words, if I had it to do over, I wouldn't have executed the lease.

"Q. Did you ever take any action to try to correct the lease or to reform the lease?

"A. We have talked to the Government about this. Six times they have changed the contracting officer. Two of them quit, and the two that quit said they would testify on our behalf. There is no recourse but to go into the Court of Claims, and when that would be settled, I will be gone from this world.

"Q. In other words then, on the evening you signed the lease, it was a take it or leave it arrangement. Is that correct?

"A. That's right. That's definitely right. They said, 'You are either going to sign this tonight, or tomorrow we are going to give it out to somebody else.'"

Thus, even though Harrison might not have been intricately familiar with the terms of the lease, such as the increase in rentals expected after five-year periods, he did know the lease was improvident and only gave it limited weight when coming to a market value for the Roosevelt Boulevard property.

It is the opinion of this court that when using the capitalization of net income approach in determining the market value of a property, the 10 percent capitalization rate suggested by petitioner must be based on a fair rental. Clearly, if the lessor agrees to a rental which admittedly is too low, the other taxpayers who secured fair rentals for their properties should not be penalized by having to pay additional taxes to the city out of their profits in order to make up the difference in the tax revenue required by the city. Such would be the result if the rule were adopted that the taxing board would have to use a minimum of a 10 percent capitalization rate on every property regardless of the

fact that the net income figure was too low through the actions of the lessor.

While the lease with the government is hurting Bair financially, it is not the duty of the Board of Revision of Taxes to remedy the situation brought about by plaintiff himself. The taxpayer-lessor should attempt to remedy his problem by means of action against the United States Government, and if he can prove the facts recited by him, the United States should properly grant relief to him. We cannot let our sympathy for the taxpayer override the revenue needs of the City of Philadelphia, and the tax rate to be paid by the other taxpayers in the City of Philadelphia. We, therefore, make the following

### ORDER

And now, to wit, October 27, 1972, it is ordered, adjudged and decreed that the fair market value of appellants' property on January 1, 1971 and January 1, 1972, was $6,510,000.

As stipulated by counsel, the ratio of assessed value to fair market value in Philadelphia County is 60 percent.

The proper assessment of appellants' property for real estate tax purposes is $3,906,000.